**Ivan KEMPNER, Plaintiff,**

**v.**

**OPPENHEIMER & CO., INC., Robert Lovasz and Jeffrey Feinberg, Defendants.**

**No. 85 Civ. 2277 (SWK).**

United States District Court, S.D. New York.

June 3, 1987.

Demov, Morris & Hammerling, New York City by Jonathan M. Herman, Felice F. Mischel, for plaintiff.

Gold, Farrell & Marks, New York City by Martin R. Gold, Robert P. Mulvey, Dana S. Singer, Robert Kleinberg, Joan Caridi, Oppenheimer & Co., Inc., New York City, for defendant Oppenheimer & Co., Inc.

Robert Lovasz, pro se.

Lord, Day & Lord, New York City by John D. Henderson, for defendant Jeffrey Feinberg.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This action arises under Sections 12 and 15 of the Securities Act of 1933 (the "Secu-

rities Act"), as amended, 15 U.S.C. §§ 77*l* and 77*o*, Sections 10 and 20 of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, 15 U.S.C. §§ 78j and 78t, and Rules 10b–5 and 10b–10 promulgated thereunder, 17 C.F.R. §§ 240.10b–5 and 240.10b–10, Sections 339–a, 339–e and 352–c of the New York General Business Law, N.Y.Gen.Bus.Law §§ 339–a, 339–e and 352–c (McKinney 1968), and common law principles of fraud, breach of fiduciary duty and negligence. Plaintiff Dr. Ivan Kempner ("Kempner") alleges fraud in connection with the offer and sale of securities, failure to disclose principal transactions, and common law fraud, breach of fiduciary duty and negligent management by defendant Oppenheimer & Co., Inc. ("Oppenheimer") and two of its employees, defendants Robert Lovasz ("Lovasz") and Jeffrey Feinberg ("Feinberg"), who were Kempner's account representatives. Lovasz and Feinberg worked jointly on all their accounts, including Kempner's.

The case is presently before the Court on the following motions: (1) Kempner's motion—in which Lovasz joins—to disqualify Oppenheimer's counsel from further representation in this action, to enjoin Oppenheimer's counsel from disclosing secrets or confidences imparted to them by Lovasz during the course of their prior representation of Lovasz, and to enjoin Oppenheimer's counsel from aiding, consulting or advising any other party or counsel to this action, (2) Oppenheimer's motion to stay this litigation, pursuant to the Federal Arbitration Act, 9 U.S.C. § 3, pending arbitration of all arbitrable claims or, alternatively, to dismiss Counts I, II, III and part of Count VII, pursuant to Rules 8, 9(b), 10 and 12(b)(6) of the Federal Rules of Civil Procedure, for various pleading deficiencies, (3) Kempner's motion for the imposition of sanctions against Oppenheimer and Oppenheimer's counsel, pursuant to Rule 37 of the Federal Rules of Civil Procedure, (4) Oppenheimer's request to move for sanctions against Kempner and Kempner's counsel, (5) Kempner's motion for an award of attorney's fees, pursuant to Rule 37, in connection with the deposition of Robert Lovasz, and in connection with its motion to disqualify, (6) Oppenheimer's request for attorney's fees in connection with Kempner's motion to disqualify, and (7) Lovasz's former counsel's motion for an award of attorney's fees to be assessed against Oppenheimer. After discussion of the history of this action, the Court addresses these motions *seriatim*.

## FACTS

This action has a long and tortured history. Moreover, most of the relevant facts are disputed by the parties. In January 1984, Kempner, then aged 72, opened securities accounts with Oppenheimer. Kempner had previously maintained cash and margin accounts at several other brokerage houses. At Oppenheimer, Kempner's alleged investment objective was to receive regular income and to maintain the safety of his principal, as Kempner was contemplating retirement. Lovasz and Feinberg acted as co-brokers for these accounts.

Kempner allegedly was in daily contact with Lovasz and Feinberg and actively traded on his account until June 1984. In May 1984, Stephen Kennard, Oppenheimer's managing director, allegedly became concerned that Kempner's aggressive speculation in index options was inconsistent with Oppenheimer's policy of investment and told Feinberg to limit trading in Kempner's account, because such trading frequently resulted in significant losses.

In June 1984, after experiencing losses from his options trading, Kempner allegedly complained to Harvey Wayne ("Wayne"), Lovasz's and Feinberg's immediate supervisor, about the handling of his account and threatened to sue Oppenheimer over the allegedly excessive, unsuitable and unauthorized options trading and securities purchases on his account. Wayne then allegedly directed Lovasz and Feinberg to prepare a memorandum detailing Kempner's active participation in the trading of his account and their request to Kempner to slow down his trading.

In March 1985, Kempner filed this action. Kempner now alleges that, just after he filed the complaint,

Lovasz was told by Joan Caridi ("Caridi"), one of Oppenheimer's inside counsel, that Oppenheimer, Feinberg and Lovasz would be represented by in-house counsel and the firm of Gold, Farrell & Marks (the "Gold firm"). Lovasz was not offered the opportunity of obtaining his own counsel, nor did Oppenheimer's counsel suggest to him that he ought to consider it. Oppenheimer's counsel never mentioned that potential or actual conflicts of interest existed among the defendants in connection with joint representation, including potential cross-claims by defendants for indemnification and contribution (Lovasz Aff., ¶ 29), and the utilization of various defense strategies which could potentially benefit some defendants at the expense of other defendants (Lovasz Aff., ¶¶ 7, 30).

Memorandum of Law in Support of Plaintiff's Motion to Disqualify Oppenheimer's Counsel ("Plaintiff's Mem."), at 6–7. Oppenheimer, on the other hand, contends (1) that, initially, Robert Kleinberg ("Kleinberg"), Oppenheimer's general counsel, and the Gold firm interviewed Feinberg and Lovasz in their capacity as employees who were obligated to inform their employer of the facts, (2) that Feinberg and Lovasz dismissed the complaint as frivolous and stressed the frequency of Kempner's calls and his approval of every trade in his account, (3) that, following the meeting, Oppenheimer decided it would defend the action in-house and agreed that it would defend Lovasz and Feinberg as long as their interests were not in conflict with counsel's representation of Oppenheimer, and (4) that Caridi then advised Lovasz and Feinberg that they were at all times free to obtain independent counsel at their own expense.

In August 1985, Oppenheimer moved to compel arbitration of Kempner's claims. Oppenheimer based its motion on arbitration clauses in three agreements in Kempner's account, a signature record and cash agreement, a customer agreement for an automatic cash investment account, and a customer agreement consent to loan of securities, i.e., a margin agreement. Because Kempner questioned the authenticity of his signature on the margin agreement at his deposition, Oppenheimer retained an independent handwriting expert who concluded that the margin agreement signature might not be authentic. Oppenheimer so advised the Court and withdrew its reliance on the margin agreement as a basis for arbitration.

Lovasz claims that Feinberg acknowledged to him that Feinberg had actually signed Kempner's name to the margin agreement and told Lovasz that it behooved him to back up Feinberg's story that he had not forged Kempner's name, as both Lovasz and Feinberg would be earning substantial commissions that year, which Lovasz would jeopardize if he did not back up Feinberg's story. Lovasz also claims that, at about the same time, he had learned that microfiche of brokers' trading records on Kempner's account had been destroyed and that certain pages of the brokers' log had been recopied and that the originals had not been produced to Kempner. Lovasz claims that he spoke to Kennard about these matters and that Kennard told him to say that he did not know who signed the disputed documents. Kennard unequivocally denies Lovasz's charge that he encouraged Lovasz to commit perjury.

Oppenheimer's counsel interviewed Feinberg and Lovasz separately regarding the signatures on Kempner's account documents. Oppenheimer's counsel's contemporaneous memorandum of the Lovasz meeting indicates that Lovasz denied that he, Feinberg or their sales assistants would sign a customer's name on an agreement. Lovasz claims he told counsel that the signatures were not his but was otherwise evasive and noncommittal. Lovasz also claims that he again spoke with Kennard who became angry when Lovasz told Kennard that he intended to tell the truth and, if asked, would reveal Feinberg's forgery.

Oppenheimer claims that, during this period, Lovasz was frequently absent from the office, was not producing, and was increasingly involved in disagreements with Feinberg. In addition, Lovasz's personal life was in a state of turmoil, and he had been barred by Court order from re-

turning to his former girlfriend's residence and from harassing her, her family, her employer or her clients at the securities firm where she was employed.

As a result of Lovasz's behavior, Kennard dissolved Lovasz's and Feinberg's partnership on October 30, 1985. Kennard alleges that he told them to reallocate their accounts based upon the nature and extent of their relationship with individual customers and to memorialize their agreement in writing. Lovasz claims that Kennard instead ordered all of their joint accounts transferred to Feinberg, leaving Lovasz with no customer accounts. Lovasz also claims that Feinberg offered Lovasz twenty percent of the commissions on their formerly joint accounts if Lovasz would not make trouble for Feinberg and would testify in such a way as to back up Feinberg's story.

On October 31, 1985, Lovasz called Kempner's counsel, Felice Mischel ("Mischel") and told her of Feinberg's alleged forgery, Oppenheimer's counsel's alleged microfiche destruction and Kennard's alleged entreaties to commit perjury. Mischel dispatched a letter to the Court, Magistrate Buchwald and the Departmental Disciplinary Committee advising them of Lovasz's allegations.

On November 4, 1985, Lovasz met with Kleinberg. Kleinberg prepared a contemporaneous memorandum of the meeting which indicates that Kleinberg, at the outset of the conversation, advised Lovasz that he ought to retain his own counsel because Kleinberg was now acting exclusively on behalf of Oppenheimer and that the conversation could not be considered privileged. Lovasz then proceeded to make accusations against Feinberg and, when Kleinberg confronted Lovasz with Mischel's letter, Lovasz stated that he had placed the call to opposing counsel in a fit of anger and in an effort to destroy Feinberg's career. Lovasz allegedly denied informing Mischel of any attorney misconduct. Lovasz alleges that Kleinberg fired him and warned him that, if he ever wanted to work in the business again, he should "keep his mouth shut about all this stuff."

Kleinberg denies ever advising Lovasz to remain silent about any of these matters. Oppenheimer also contends that Lovasz was notified immediately thereafter by letter of his termination.

After his termination, Lovasz met with Oppenheimer and the Gold firm. Oppenheimer claims the meeting was voluntary, while Lovasz alleges he was told he must meet with the Gold firm and was picked up at home by limousine and taken to the office. Contemporaneous memoranda of this meeting prepared by the Gold firm indicate that Lovasz launched into a disjointed diatribe against Feinberg and Kennard and confided that he had witnessed Feinberg's forgery. Lovasz claims that he told counsel he was willing to testify as to these events, that counsel advised him not to say anything about what he knew until he had had time to think about it, and that Lovasz left with the distinct impression that counsel did not want him to tell what he knew to be the truth.

On November 6, 1985, the Court scheduled a conference on the alleged document destruction. At that conference, Oppenheimer's counsel moved to withdraw as Lovasz's counsel, and the Court granted the motion. Gold explained to the Court that the microfiche record of Lovasz's account had not been destroyed and that Lovasz's original account statements had now been found and produced. Caridi explained that any difficulty in locating the allegedly destroyed microfiche statements had been the result of a misspelling of Lovasz's name in the computer retrieval process and that the missing microfiche had indeed been located and produced. Lovasz, when questioned by the Court, agreed that his concerns had been satisfied.

On November 12, 1985, Oppenheimer terminated Feinberg. Ten days later, Oppenheimer's counsel moved to withdraw as Feinberg's counsel, and the Court granted that motion.

Discovery proceeded under the Magistrate, and, on March 7, 1986, the Court ordered that the depositions of Lovasz and Feinberg be continued at the courthouse to assure the prompt resolution of disputes

before the Magistrate. On March 10, Kempner continued the deposition of Feinberg. Because Lovasz, who was now living in Arizona, had arranged with Kempner's counsel to be available only on March 10 and 11, the parties agreed to continue Lovasz's deposition on March 11 and Feinberg's on March 13.

At the conclusion of Kempner's direct examination of Lovasz on March 11, Kempner's counsel, seconded by Lovasz, objected to cross-examination of Lovasz by Oppenheimer's counsel on the grounds that Oppenheimer's in-house and co-counsel should be disqualified. Upon hearing argument, the Magistrate criticized Kempner's counsel for permitting a full day of deposition testimony when he knew that he was going to raise an objection as to cross-examination. The Magistrate ruled that Lovasz, who was no longer under the subpoena power of the Court and about to return to Arizona, was under an obligation to return for cross-examination at his own expense and that there was a genuine question as to whether his deposition of direct examination could be utilized by Kempner if Lovasz failed to return for cross-examination. Nonetheless, Lovasz's unchallenged testimony does serve as a major basis for Kempner's motion.

The Magistrate ordered that, as the disqualification issue had been "kicking around" for some time, any motion to disqualify be made within thirty days or the grounds for any potential disqualification would be waived and that discovery be stayed. The Magistrate also permitted Oppenheimer, in reply, to seek whatever relief it thought appropriate, including striking Lovasz's deposition. The Magistrate's ruling was confirmed by the Court in a March 21, 1986 conference. The Court, however, directed Oppenheimer to refrain from filing a cross-motion for sanctions until the disqualification motion had been decided.

## DISCUSSION

### I. *The Disqualification Motion*

Kempner contends that Oppenheimer's in-house counsel, as well as the Gold firm, must be disqualified as Oppenheimer's counsel. First, Kempner argues that, because Oppenheimer's counsel formerly represented Lovasz in this action, Canon 4 of the Code of Professional Responsibility requires that Oppenheimer's counsel now be disqualified from continued representation of Oppenheimer in this action to prevent the possibility that Oppenheimer's counsel will use Lovasz's confidences to the latter's disadvantage. Second, Kempner argues that Oppenheimer's counsel must be disqualified under Canon 5 because (1) counsel's continued representation of Oppenheimer jeopardizes their former client Lovasz's interests in violation of DR 5–105, and (2) Oppenheimer's counsel ought to be called as witnesses, which disqualifies them under DR 5–102. Third, Kempner contends that Oppenheimer's counsel must be disqualified under Canon 9 which requires that a lawyer avoid not only the fact, but even the appearance, of professional impropriety.

### A. *Canon 4 Issues*

Ordinarily an attorney cannot knowingly reveal a confidence or secret of his client to the disadvantage of that client. *Evans v. Artek Systems Corp.*, 715 F.2d 788, 791 (2d Cir.1983); ABA Comm. on Ethics and Professional Responsibility, Code of Professional Responsibility, Canon 4. Canon 4 provides that "[a] lawyer should preserve the confidences and secrets of his client." Disciplinary Rule 4–101(B) provides:

Except when permitted under DR 4–101(c), a lawyer shall not knowingly:

(1) Reveal a confidence or secret of his client.

(2) Use a confidence or secret of his client to the disadvantage of the client.

(3) Use a confidence of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

In the Second Circuit, an attorney may be disqualified from representing a client in a particular case if

(1) the moving party is a former client of the adverse party's counsel; (2) there is a

substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to relevant privileged information in the course of his prior representation of the client.

*Evans,* 715 F.2d at 791.[1] Thus, the rule in this Circuit is that an attorney may be disqualified under Canon 4 if he has accepted employment adverse to the interests of a former client on a matter substantially related to the prior litigation. *Allegaert v. Perot,* 565 F.2d 246, 250 (2d Cir.1977). Furthermore, once a substantial relationship has been established, the court need not inquire whether the attorney in fact received confidential information, because the receipt of such information will be presumed. *Id.* The purpose of this prophylactic rule is "to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage." *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 570 (2d Cir.1973).

Nonetheless, this Circuit had held that the substantial relationship test is inapplicable where the law firm's alleged disqualification arises out of simultaneous representation of two clients if each client was aware of the other's relationship to the firm and had no reason to believe that confidences of one party would be withheld from the other. *American Special Risk Insurance Company v. Delta America Re Insurance Co.,* 634 F.Supp. 112, 121 (S.D. N.Y.1987) (citing *Allegaert,* 565 F.2d at 250–51; *Neiman v. Local 144,* 512 F.Supp. 187, 189 (S.D.N.Y.1981)). This rule has been followed in other cases in this Circuit where the complaining former client imparted confidential information to the law firm when it was aware of the firm's representation of the now adverse party and therefore was not in a position to expect the firm would withhold from its primary client any secrets which it obtained from the complaining client. *See, e.g., American Special Risk Insurance,* 634 F.Supp. at 121; *CAM v. E.B. Marks Music, Inc.,* 558 F.Supp. 57, 59 (S.D.N.Y.1983); *Waterbury Garment Corp. v. Strata Products, Inc.,* 554 F.Supp. 63, 66 (S.D.N.Y.1982); *Premium Products Sales Corp. v. Chipwich, Inc.,* 539 F.Supp. 427, 434–35 (S.D.N.Y.1982); *Wayland v. Shore Lobster & Shrimp Corp.,* 537 F.Supp. 1220, 1223 (S.D.N.Y.1982).

■ The logic of the *Allegaert* line of cases fully applies here, as this is not a typical former client action where the attorney switched sides after representation of the former client had ended. *See American Special Risk Insurance,* 634 F.Supp. at 121. Here, as in *Trinity Ambulance Service v. G & L Ambulance Services, Inc.,* 578 F.Supp. 1280 (D.Conn.1984), the "adversity of interests arose during the pendency of a single litigation and ... the attorneys who are targets of the disqualification motions continue to represent the same clients. Unlike the typical situation giving rise to a disqualification motion of this sort, it is a client, not an attorney, who has 'changed sides'." *Id.,* 578 F.Supp. at 1282. Here, also as in *Trinity Ambulance, Allegaert's* reasonable expectation of secrecy requirement bars disqualification of Oppenheimer's counsel:

> The expectation that information conveyed to a co-party's counsel will be held in confidence from that attorney's client is no more plausible than the expectation that an attorney concurrently representing parties in the execution of a joint venture or franchise agreement will keep information relayed to him by one party secret from the other. In both situations, the party seeking disqualification

---

**1.** While it is clear that Kempner's attorneys are obligated to call to the Court's attention any incidents of which they have unprivileged knowledge involving violations of a disciplinary rule, *Dunton v. County of Suffolk,* 729 F.2d 903, 909 (2d Cir.1984), it appears that Kempner may not have standing to bring this motion to disqualify with respect to Canon 4, as the "moving party" must be "a former client of the adverse party's counsel," *Evans,* 715 F.2d at 791. Nonetheless, Lovasz joins in the motion and Lovasz, as a "former client of the adverse party's counsel," clearly does have standing to bring this motion.

should have been aware at the time of the previous transaction or proceeding that information garnered by attorneys in the course of furthering the common enterprise would be revealed by those attorneys to the other parties involved. That the adversity of interests in this instance arose during the pendency of a single lawsuit—rather than in a subsequent action, as in *Allegaert v. Perot* and other cases—is of no consequence. Information does not become more or less confidential because its disclosure is threatened in the same proceeding rather than in a separate, subsequent proceeding.

*Trinity Ambulance*, 578 F.Supp. at 1282.

When Oppenheimer offered to represent both itself and its now former employees in this action, Oppenheimer had no expectation that Lovasz's and Feinberg's interests would become adverse, as Lovasz and Feinberg had represented the matter as a frivolous stock fraud claim. As the *Allegaert* line of cases demonstrates, where there is such dual representation, Lovasz could not expect his secrets to be withheld from Oppenheimer. Also as in the *Allegaert* line of cases, it is the client, and not the attorney, who has changed position. As a result, the substantial relationship test and the Canon 4 former client doctrine are inapplicable here.

## B. *Canon 5 Issues*

Kempner argues that, in view of the inherent conflicts which have existed and still exist among the defendants, Oppenheimer's counsel have not exercised in the past, and could not exercise in the future, the independent professional judgment required of them by DR 5–105(A) and (B).

DR 5–105(A) and (B) of the Code of Professional Responsibility provide:

(A) A lawyer shall decline proferred employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

Initially, Oppenheimer's counsel had no reason to suspect, based on Lovasz's and Feinberg's assertions, that a conflict of interest would develop such that representing both itself and its employees would not be feasible. When the forgery allegations first devolved, Oppenheimer's counsel immediately moved to disassociate itself from Lovasz and Feinberg. Thus, Oppenheimer's counsel did not violate DR 5–105(A) or (B) in representing Oppenheimer and its employees to the point where it became obvious that a potential conflict of interest had developed between Oppenheimer and its employees, and Oppenheimer moved swiftly to disassociate itself from Lovasz and Feinberg once the alleged forgery was uncovered. Such conduct simply does not violate DR 5–105(A) and (B) and is therefore not grounds for disqualification.

Kempner also seeks disqualification of Oppenheimer's counsel on the basis of the attorney as witness prohibition of DR 5–102(A) and (B). DR 5–102(A) provides that an attorney should withdraw as trial counsel if he "ought to be called as witness on behalf of his client." DR 5–102(B) provides that a lawyer called by his adversary as a witness may continue representation unless his testimony "is or may be prejudicial to his client."

Kempner argues that Oppenheimer's attorneys

ought to be called to attempt to rebut Lovasz's testimony with respect to (a) Feinberg's forgeries of Dr. Kempner's signature on the account agreements; (b) the destruction, recopying and/or failure to produce documents demanded by plaintiff's counsel; (c) the threats of Oppenheimer's employees and the encour-

agement by its counsel that Lovasz withhold the truth while testifying at his deposition; and (d) the consequences suffered by Lovasz as a result of his disclosures to plaintiff's counsel, including the termination of his employment at Oppenheimer and his conversations with Kleinberg, Marks and Mulvey subsequent thereto.

Plaintiff's Mem. at 42.

■ The application of the Code does not depend upon whether Oppenheimer's counsel "*will*" be called but whether, as the Code provides, he '*ought* to be called as a witness' in the case [ ]. Moreover, the Code makes no distinction as to whether he acts as a witness in the case in chief or on rebuttal." *J.P. Foley & Co., Inc. v. Vanderbilt*, 523 F.2d 1357, 1359 (2d Cir.1975) (per curiam). Nonetheless, Kempner has not shown that Oppenheimer's counsel were so intimately involved in the issues as to which Kempner claims their testimony is required that they ought to be called as witnesses in order to "rebut Lovasz's testimony." in this action. *See American Special Risk Insurance Co.*, 634 F.Supp. at 122. The rule is simply not implicated where "plaintiffs' prima facie case [or, presumably, defendant's rebuttal] can readily be presented through documents and the testimony of other witnesses who have first hand knowledge of the facts." *Ross v. Great Atlantic & Pacific Tea Co., Inc.*, 447 F.Supp. 406, 408 (S.D.N.Y.1978).

First, there is no contention that Oppenheimer's attorneys participated in, contemporaneously knew about, or somehow condoned Feinberg's alleged forgery of Kempner's signature on Kempner's account documents. Should Lovasz testify as to his knowledge of Feinberg's alleged forgery, then Feinberg is available to rebut this testimony. Because Oppenheimer's attorneys have no first hand knowledge of the forgeries—but, rather, are aware only of what Lovasz told them in their capacity as attorneys—there is no reason that they ought to be called as witnesses in this regard.

Second, the purported destruction and recopying of documents was the subject of a November 6, 1985 conference before the Court, and the alleged "missing memorandum", which indeed appears to be a privileged document, was produced by Oppenheimer in response to Kempner's disqualification motion. Since the allegedly missing or destroyed documents have been produced and accounted for, either at the November 6 conference or in response to the instant motion, the Court is satisfied that no documents were destroyed and that the recopied documents can be verified for accuracy. Kempner has provided no new facts to warrant resurrection of these allegations again, and any further disputes which may arise when discovery resumes again can be resolved at that time as they arise.

Third, Kempner has provided no rationale whatsoever as to why Oppenheimer's counsel should be called to testify as to any threats or inducements to commit perjury allegedly committed by other Oppenheimer employees, such as Kennard or Feinberg. There is no allegation that counsel either encouraged or participated in these alleged discussions, or, indeed that they were told of such activities after they occurred. Moreover, any discussion of such alleged statements subsequently made to Oppenheimer's counsel in their capacity as counsel would undoubtedly be privileged in nature. As a result, the Court is unable to find any reason whatsoever that Oppenheimer's counsel should be called to testify in this regard.

Fourth, the summary statement of Lovasz—whose credibility already is strained—that he left a meeting with counsel with the distinct impression that counsel did not want him to testify, is unsupported and clearly insufficient to warrant disqualification here. Furthermore, the present litigation concerning alleged securities fraud, is not even the proper forum in which to air alleged grievances concerning counsel in the action. If counsel are "guilty of professional misconduct, as to which we express no view, the appropriate forum is the Grievance Committee of the bar association. Whatever sanction if any that is imposed there will not affect the

rights of a plaintiff [or, presumably, a defendant] long since embarked upon serious litigation." *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir.1976). As a result, any testimony on the part of Oppenheimer's counsel which ought to be heard in this regard would properly be before the Grievance Committee.

Finally, Kempner's attorneys provide no rationale as to why Oppenheimer's counsel would have any evidence whatsoever as to the consequences Lovasz allegedly suffered as a result of his disclosures, nor do Kempner's attorney's explain why such testimony is relevant to Kempner's securities fraud action. Given these considerations, disqualification under Canon 5 is simply not warranted here.

## C. *Canon 9 Issues*

Kempner also moves to disqualify Oppenheimer's counsel under Canon 9 of the Code. Canon 9 requires that a lawyer avoid not only the fact, but even the appearance, of professional impropriety. *Fund of Funds, Ltd. v. Arthur Anderson & Co.*, 567 F.2d 225, 234–35 (2d Cir.1977); *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir.1976).

The Second Circuit has analyzed the cases in this Circuit which suggest that this Circuit has "utilized the power of trial judges to disqualify counsel where necessary to preserve the integrity of the adversary process in actions before them." *Board of Education of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979).

> In other words, with rare exceptions disqualification has been ordered only in essentially two kinds of cases: (1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client, or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Canons 4 and 9, thus giving his present client an unfair

advantage.... But in other kinds of cases, we have shown considerable reluctance to disqualify attorneys despite misgivings about the attorney's conduct. This reluctance probably derives from the fact that disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons. And even when made in the best of faith, such motions inevitably cause delay.... Weighing the needs of efficient judicial administration against the potential advantage of immediate preventive measures, we believe that unless an attorney's conduct tends to "taint the underlying trial, disturbing the balance of the presentations in one of the two ways indicated above, courts should be quite hesitant to disqualify an attorney. Given the availability of both federal and state comprehensive disciplinary machinery, there is usually no need to deal with all other kinds of ethical violations in the very litigation in which they surface.

*Id.* (citations and footnotes omitted).

The major thrust of Kempner's Canon 9 argument is that the appearance of impropriety arises over Oppenheimer's incentive to use Lovasz's secrets and confidences against him. However, the Court already has determined that Oppenheimer's counsel have violated neither Canon 4 nor Canon 5. As a result, Kempner's Canon 9 argument must also fail here.

Accordingly, Kempner's motion for disqualification of Oppenheimer's counsel under Canons 4, 5 and 9 of the Code of Professional Responsibility is denied.

## II. *The Motion to Stay this Litigation Pending Arbitration*

Oppenheimer moves for an order staying this litigation pursuant to Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, pending arbitration of all arbitrable claims in the Amended Complaint.

Initially, Oppenheimer's motion was based on arbitration clauses contained in three documents: a Signature Record and Cash Agreement, a Customer Agreement

for Oppenheimer Automatic Cash Investment Account, and a Customer Agreement for Consent to Loan of Securities (the "margin agreement"). At his deposition, Kempner acknowledged that he signed the Signature Record and Cash Agreement and the Customer Agreement for Oppenheimer Automatic Cash Investment Account, but not the margin agreement. Oppenheimer conducted an investigation and determined that it had reason to believe that Kempner had not signed this agreement. Although, at this stage of its inquiry, Oppenheimer had not been able to determine who signed the margin agreement or whether it had been signed by someone acting on Kempner's behalf or with his authorization, Oppenheimer no longer felt justified in relying upon the margin agreement and withdrew it as a basis for its motion to stay this litigation pending arbitration. Oppenheimer's reliance on the other two agreements remains unchanged.

The Amended Complaint sets forth seven claims for relief: (1) for violations of Section 12 of the Securities Act and Section 10(b) of the Exchange Act; (2) for violations of Rule 10b–10 and Section 11(d) of the Exchange Act; (3) for rescission of margin and option agreements; 4) for common law fraud and breach of fiduciary and other duties; (5) for negligent mismanagement; (6) for violations of Sections 339–a, 339–e and 352–c of the New York General Business Law; and (7) for violations of Section 15 of the Securities Act, Section 20(a) of the Exchange Act and the common law.

Section 2 of the Arbitration Act provides that

> A written provision in any ... contract ... involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract.

9 U.S.C. § 2. The Supreme Court has held that "the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985). In *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the Supreme Court created an exception to the Arbitration Act. *Wilko* holds that predispute agreements to arbitrate claims that arise under Section 12(2) of the Securities Act are unenforceable.

In view of *Wilko* and the similarity of the non-waiver provisions of the Securities Act and the Exchange Act, the Second Circuit consistently has held that claims under Section 10(b) of the Exchange Act and Rule 10b–5 thereunder also are not arbitrable despite the existence of a predispute agreement to arbitrate. *McMahon v. Shearson/American Express, Inc.*, 788 F.2d 94, 96–97 (2d Cir.), *cert. granted,* —— U.S. ——, 107 S.Ct. 60, 93 L.Ed.2d 20 (1986). Although the Supreme Court has granted *certiorari* in *McMahon* and this issue will soon receive the Supreme Court's renewed attention, *see Suthirachartkul v. Shearson Lehman Brothers Inc.*, 806 F.2d 37, 39 (2d Cir.1986), the Court will adhere to the settled law of this Circuit as it stands at the present time. Accordingly, Oppenheimer's motion to compel arbitration of Kempner's claims under the Securities Act and the Exchange Act is denied without prejudice to renew should a change in the law require reconsideration.

Nonetheless, the *McMahon* court held that plaintiff's pendent state law claims were arbitrable even though the federal federal claims were not within the scope of the arbitration clause:

> Under the Supreme Court's decision in *Dean Witter Reynolds Inc. v. Byrd, supra,* these state law claims must be sent to arbitration where there is an enforceable arbitration clause and where a party's motion to compel arbitration encompasses the state law claims, as here. *See also AFP Imaging Corp. v. Ross, supra,* 780 F.2d [202] at 205 [2nd Cir.1985]. The Court's language in *Byrd* is unequivocal.

"[T]he Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums."

105 S.Ct. at 1241. The Court also recognized that such bifurcated proceedings could result where securities or antitrust violations are alleged. 105 S.Ct. at 1241 n. 5. We hold that the district court correctly held that the pendent state claims were arbitrable. Despite the potential inefficiency of bifurcated proceedings, we are obliged under *Byrd* to affirm that part of the district court's order compelling arbitration of the pendent state law claims.

*McMahon*, 788 F.2d at 99 (footnotes omitted). The McMahon court also noted that should plaintiff withdraw his pendent state law claims, that would result in no claims left to be arbitrated, all remaining claims would be litigated in federal court, and bifurcated proceedings would be avoided. *McMahon*, 788 F.2d at 99 n. 7.

■ Accordingly, the Court determines that Kempner's state law claims are arbitrable and should be submitted to arbitration, even though this will result in bifurcated proceedings here.

Alternatively, Oppenheimer argues that, if Kempner's Exchange Act and Securities Act claims are not referred to arbitration, they must be dismissed pursuant to Rules 8, 9(b) and 10 of the Federal Rules of Civil Procedure for failure to provide a short and plain statement of the claim, to plead fraud with particularity and to make the averments of the claim in numbered paragraphs limited to a statement of a single set of circumstances and pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state claims upon which relief may be granted.

■ Oppenheimer's arguments are not availing. Kempner's Amended Complaint constitutes an extensive statement of the facts upon which liability is claimed. It sets for the alleged facts evidencing a scheme and course of conduct that alleg-

edly violate Section 12(2) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5, and it relates to claims of unsuitability, churning and options fraud. The Amended Complaint also meets the requirements of Rule 9(b) because it specifies the allegedly wrongful conduct and identifies "the transactions in question and the securities involved" and gives "at least ... some indication why [Kempner] considers such securities to have been unsuitable." *Vetter v. Shearson, Hayden Stone, Inc.*, 481 F.Supp. 64 (S.D.N.Y.1979); *Higgins v. Merrill Lynch Pierce Fenner & Smith, Inc.*, [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,242 (S.D.N.Y. 1983) [Available on WESTLAW, DCT database].

Furthermore, examination of the pleadings demonstrates that Kempner has alleged facts sufficient to support his federal securities claims. Count I specifies Oppenheimer's allegedly fraudulent activities in violation of Section 12(2) of the Securities Act and Section 10(b) of the Exchange Act, and includes the dollar amount of the purchases and sales, the number of transactions, the turnover ratio, the commission charges, margin interest charges and portfolio loss on the account. Count II specifies that Oppenheimer's alleged failure to inform Kempner fully of its possible conflict of interest, in that it was a market maker in the securities which it recommended for purchase violated both the 1933 and 1934 Acts and Rule 10b–5. *See Chasins v. Smith, Barney & Co., Inc.*, 438 F.2d 1167, 1172 (2d Cir.1971).

Accordingly, Oppenheimer's motion to dismiss Kempner's federal securities claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted is denied.

III. *Sanctions and Attorneys' Fees in Relation to Oppenheimer's Motion to Disqualify*

Both Kempner and Oppenheimer request the imposition of sanctions and an award of attorneys' fees against the other pursuant to Rule 11 of the Federal Rules of Civil Procedure. Given the vexatious nature of

this litigation to date on the part of both parties, the Court declines to impose sanctions or award attorneys' fees in relation to Kempner's motion to disqualify against either party at this time.

Instead, the Court reminds the parties that the Court has the power to impose sanctions and award attorneys' fees *sua sponte* or on motion under the following circumstances: (1) under the Court's inherent power to supervise and control its own proceedings and where the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," *F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974); (2) under 28 U.S.C. § 1927, where an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct," *id.;* (3) under Rule 11 of the Federal Rules of Civil Procedure, where a "pleading, motion or other paper" is not "well grounded in fact" or "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law," or is "interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," Fed.R. Civ.P. 11; and (4) under Rule 37 of the Federal Rules of Civil Procedure, where, inter alia, a "party or a person designated ... to testify on behalf of a party fails to obey an order to provide or permit discovery," or fails "to attend at own deposition or serve answers to interrogatories or respond to request for inspection," or "fails to participate in good faith in the framing of a discovery plan," or "Fails to admit the genuineness of any document or the truth of any matter," Fed.R.Civ.P. 37.

Both Kempner's and Oppenheimer's conduct in this litigation to date has been characterized by vituperative hyperbole which has resulted in inordinate delay in the adjudication of this dispute. The Court warns the parties that it will not tolerate any further delay and will fully utilize its power to impose sanctions as necessary for any further dilatory tactics on the part of any party to this litigation.

The parties are directed to complete discovery in this action by September 30, 1987. The parties are further directed to jointly prepare and submit to the Court by June 3, 1987 a proposed plan and schedule for the timely completion of discovery. The parties are further directed to attend a joint discovery/pretrial conference at 10:30 A.M. on Friday, June 5, 1987, two days after submittal of their joint discovery plan and schedule.

IV. *The Motions for Award of Attorneys' Fees Pursuant to Rule 37 in Connection with Lovasz's Deposition*

Defendant Lovasz and plaintiff Kempner each move for an order, pursuant to Rule 37 of the Federal Rules of Civil Procedure, awarding Lovasz—who at the time was represented by counsel—and Kempner their attorneys' fees, costs and disbursements in connection with the deposition of Lovasz which had been scheduled on November 18, 1985. For a number of reasons, Lovasz's deposition did not occur on that date.

The affidavits submitted by Kempner, Oppenheimer and Lovasz's attorney, Frederick H. Cohn ("Cohn"), demonstrate that Kempner and Oppenheimer both were engaged in dilatory tactics which indeed did result in the postponement of Lovasz's scheduled deposition and an extension of the discovery deadline. As a result, the Court finds it inappropriate to award attorneys' fees to Kempner when Kempner's attorneys were in part responsible for the delay.

Lovasz's motion, however, is granted because Cohn in no way was responsible for the postponement of Lovasz's deposition. Indeed, Lovasz and Cohn arrived at the scheduled time for the deposition and was informed by Oppenheimer's counsel that he sought an adjournment because Feinberg was unrepresented at the deposition.

Cohn has submitted an affidavit outlining his expenses in this matter: approximately 1½ hours of his time at a rate

of $175.00 per hour and taxi fare to the deposition of $3.10. Cohn has chosen to forego seeking reimbursement for either the taxi tip or for his time in preparing the affidavit in support of this motion. The Court therefore finds an award of counsel fees and expenses in the total amount of $265.50 to be reasonable and assesses half that amount against defendant Oppenheimer and half that amount against plaintiff Kempner. This award, split between Oppenheimer and Kempner, is intended as a further warning that this Court will tolerate no more delay by the parties in the timely adjudication of this litigation.

## CONCLUSIONS

Accordingly, Kempner's motion to disqualify Oppenheimer's counsel is denied. Oppenheimer's motion for an order staying this litigation pending arbitration of all arbitrable claims is denied without prejudice as to the federal securities claims. The state law claims are arbitrable and will be submitted to arbitration. However, litigation of Kempner's federal securities claims will not be stayed during the pendency of the arbitration of the state court claims. Oppenheimer's motion to dismiss the federal securities claims pursuant to Rules 8, 9(b), 10 and 12(b)(6) of the Federal Rules of Civil Procedure is denied. Oppenheimer's and Kempner's request for sanctions and awards of attorneys' fees against each other pursuant to Rule 11 of the Federal Rules of Civil Procedure are denied. Kempner's motion for an award of attorneys' fees pursuant to Rule 37 of the Federal Rules of Civil Procedure is denied, and Lovasz's motion for an award of attorneys' fees pursuant to Rule 37 is granted.

SO ORDERED.