Pascale FELIX, Plaintiff,

v.

Sharon BALKIN, Saks Fifth Avenue and Parfums Givenchy, Defendants.

Iris Nunez, Plaintiff,

v.

Sharon Balkin, Saks Fifth Avenue, Clarins U.S.A., Inc. and Thierry Mugler Parfums, Defendants.

Ketly Calixte, Plaintiff,

v.

Sharon Balkin, Saks Fifth Avenue, The Donna Karan Company, Donna Karan New York and The Donna Karan Beauty Company, Defendants.

Lourdes Morales, Plaintiff,

v.

Sharon Balkin, Saks Fifth Avenue, Clarins U.S.A., Inc. and Thierry Mugler Parfums, Defendants.

Denise Felix, Plaintiff,

v.

Sharon Balkin, Saks Fifth Avenue, The Donna Karan Company, Donna Karan New York and The Donna Karan Beauty Company, Defendants.

Krista Lorn Powell, Plaintiff,

v.

Sharon Balkin, Saks· Fifth Avenue, Clarins U.S.A., Inc. and Thierry Mugler Parfums, Defendants.

Nos. 98 Civ. 4491 AKH, 98 Civ. 4492 AKH, 98 Civ. 4493 AKH, 98 Civ. 4495 AKH, 98 Civ. 4497 AKH and 98 Civ. 4498 AKH.

United States District Court, S.D. New York.

May 7, 1999.

Daniel Williams, Fran L. Rudich, Helene Mark, Thornton & Tanenhaus, New York City, Michael F. Janus, The Law Office of Michael Lamonsoff, for plaintiffs.

Richard L. Steer, Peter Shapiro, Jones Hirsch Connors & Bull, P.C., Joan M. Gilbride, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, New York City, for defendant Clarins U.S.A., Inc.

Frances Mary Maloney, Epstein, Becker & Green, P.C., New York City, for defendants Sharon Balkin, Saks Fifth Avenue.

## MEMORANDUM AND ORDER

HELLERSTEIN, District Judge.

I resolve in this decision issues of disqualification of counsel, raised by plaintiff Lourdes Morales' motion to disqualify and by my own enlargement of the issues. I have jurisdiction to do so because of the court's responsibility concerning the obligations of professionalism in the matters coming before it. *See Ceramco, Inc. v. Lee Pharmaceuticals,* 510 F.2d 268, 271 (2d Cir.1975) ("Courts have not only the supervisory power but also the duty and responsibility to disqualify counsel for unethical conduct prejudicial to his adversaries."); *see also Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975) ("The district court bears the responsibility for the supervision of the members of its bar."); *Red Ball Interior Demolition Corp. v. Palmadessa,* 908 F.Supp. 1226, 1245 (S.D.N.Y. 1995) ("A trial judge has the inherent authority to regulate lawyers' professional conduct.").

There are six lawsuits pending before me, consolidated for pre-trial purposes by a stipulation and order (the "Stipulation and Order") dated September 9, 1998. All of the matters allege a hostile work environment in the cosmetics and fragrance department of the Saks Fifth Avenue department store ("Saks") located in Manhattan, New York. Each of the plaintiffs allege inappropriate, unwanted touchings

and comments by defendant Sharon Balkin, a Saks supervisory employee, and inadequate responses and retaliations by Saks and the perfume companies named as defendants.

Three of the six plaintiffs, Lourdes Morales, Iris Nunez and Krista Lorn Powell, were employees or subordinate supervisors who worked at the Thierry Mugler Parfums counter at Saks. The three sue Balkin, Saks, Thierry Mugler, and Thierry Mugler's parent company, Clarins U.S.A. Inc.[1], alleging violations of federal, state and New York City laws; *see, e.g.,* 42 U.S.C. §§ 2000e, *et seq.;* N.Y.Exec.Law §§ 296.1, 296.6 and 296.7; N.Y.Comp. Codes R. & Regs. § 8–107. Plaintiff Pascale Felix's complaint against Balkin, Saks and Parfums Givenchy, and plaintiffs Ketly Calixte's and Denise Felix's complaints against Balkin, Saks, The Donna Karan Company, Donna Karan New York and The Donna Karan Beauty Company, make similar allegations.

Thornton & Tanenhaus and the Law Office of Michael S. Lamonsoff, Esq. ("Lamonsoff"), represent all six plaintiffs, and Epstein Becker & Green, P.C. represents Balkin and Saks in each of the six actions. Clarins is represented by Jones Hirsch Connors & Bull P.C. ("Jones Hirsch") in the Nunez and Powell actions, and by Wilson, Elser, Moskowitz, Edelman & Dicker, LLP ("Wilson Elser") in the Morales action. Other counsel represent the perfume companies sued in the other three actions.

The defendants have denied liability and alleged affirmative defenses. A joint motion to dismiss, a motion for summary judgment, and a motion for judgment on the pleadings are pending before me and are being resolved separately. Discovery has just begun, pursuant to the terms of the Stipulation and Order referred to above, only to be halted by the motion of plaintiff Lourdes Morales to disqualify Jones Hirsch from representing Clarins in the companion *Nunez* and *Powell* actions.

## I. *MORALES' DISQUALIFICATION MOTION*

Plaintiff Morales contends that the Jones Hirsch law firm should be disqualified because its partner, Richard L. Steer, had represented her as well as Clarins in defense of a related sexual harassment and discrimination complaint brought by another employee who worked at the Thierry Mugler perfume counter, Michael A. Blake. Morales contends that Steer and Jones Hirsch gained "secrets and confidences" from her during the dual representation, and can use them against her interests. For the reasons discussed below, I find that Morales' argument lacks merit. However, there are additional grounds for disqualification that I must consider, of both Steer and, of counsel for Morales, Thornton & Tanenhaus and Lamonsoff. I hold, in the interests of justice and incident to the district court's supervisory responsibility with regard to maintaining proper professional standards in the matters before it, and for the reasons discussed below, that Steer and Jones Hirsch, and Thornton & Tanenhaus and Michael S. Lamonsoff, should be disqualified from representing, respectively, defendant Clarins, and plaintiffs Nunez, Powell and Morales, and I so order.

### A. *The Employment Structure at Saks:*

The perfume counters of the Saks department store in Manhattan are located on the first floor of the store. Perfume vendors, like Thierry Mugler, Donna Karan and Givenchy, occupy the counters and offer their products through beauty consultants and salespersons whom they employ or with whom they contract.[2] (Morales' Complaint, Ex. B to Affidavit of Fran

---

1. Thierry Mugler Parfums is a division of Clarins U.S.A. Inc., and not an entity that can be sued. I refer to this defendant sometimes as Clarins and sometimes as Thierry Mugler.

2. I refer to such persons as employees, without attempting in this opinion to find if they are employees or independent consultants.

L. Rudich, dated January 5, 1999 ("Rudich 1/5/99 Aff."), at ¶¶ 17–18). Plaintiffs Morales, Nunez and Powell were employees of Thierry Mugler. In addition, Morales was a supervisor and the Business Manager of the counter. (*Id.* at ¶ 16).

The employees of the various perfume vendors lacked authority to operate Saks' cash register and ring up sales of perfume. (*Id.* at ¶ 18). They were required to bring their sales to a Saks employee assigned as liaison to the perfume vendors. (*Id.*). Defendant Balkin was the Saks liaison to the Thierry Mugler, Givenchy and Donna Karan perfume counters. (*Id.* at ¶ 19).

## B. *The Blake Proceeding*

In November 1996, Michael A. Blake, a sales assistant employed by Thierry Mugler at Saks, filed a charge of discrimination with the New York City Commission on Human Rights (the "Blake Proceeding"). (Affidavit of Richard L. Steer, dated January 18, 1999, at ¶ 4 ("Steer Aff., at \_\_")). Blake alleged that Balkin sexually harassed him, between July 17, 1996 and August 17, 1996, by unwanted and unwelcome touchings and suggestive comments, and that he was paid less than similarly situated Hispanic employees. (*Blake v. Thierry Mugler, et al.*, NYCCHR Complaint No.: N–E–S–97–1003233E ("Blake Complaint") at ¶¶ 6, 7). Blake alleged that he reported the acts of harassment to Lourdes Morales, his Thierry Mugler supervisor, and to Saks; that no one remedied his complaint; and that, on or about August 23, 1996, Morales terminated Blake's employment. (*Id.* at ¶¶ 8, 9). Blake alleged that Thierry Mugler, Saks and Morales "discriminated against him by subjecting him to disparate treatment and sexually harassing him and terminating his employment ... in violation of Section S–107.1(a) of the Administrative Code of the City of New York ... [and in] violat[ion of] Title VII of the Civil Rights Act of 1964. ..." (*Id.* at ¶¶ 10–11).

Clarins' insurer retained Richard L. Steer, a partner of Jones Hirsch and a specialist in the field, to represent it and Morales jointly, in November 1996. Steer, based on a "thumbnail" sketch of the issues by Clarins' Manager of Human Resources, Lily Babler, expressed the view that he could represent both Clarins and Morales jointly, without conflict. (Transcript of Argument, April 14, 1999 (hereafter, "Tr.Arg.")), pp. 27–28; (Letter from Richard L. Steer responding to Court Ordered Interrogatories, dated March 23, 1999, at ¶ 1(a–c) ("Jones Hirsch Response")). Steer, during an ensuing meeting with Babler and Morales in January 1997, told Morales that she "could get her own counsel if she wanted," but that he could represent her, except if there was a conflict, and "I didn't see any conflict." (Tr. Arg.p.28). Morales responded that "she didn't think there was a conflict either" (Tr. Arg. p. 28), and that "she had no objection to [Steer] representing her." (Jones Hirsch Response, at ¶ 1 (a–c)). Steer, however, did not speak to Morales individually. Nor did he question her to ascertain if, in fact, a conflict existed or might potentially arise, or explain the consequences of dual representation and potential conflicts, or come to his own reasoned opinion with regard to the issues of conflict and separate representation. (Tr. Arg. pp. 29–30). Steer also failed to enter into an engagement letter with either of his clients, or even prepare a memorandum for his files, covering the possibility of conflict and defining what might happen if a conflict between his two clients were to arise. After these meetings, Steer filed a joint verified answer denying Blake's allegations, verified by both Morales and Clarins on January 9, 1997, and, after meeting with Morales on May 8, 1997 to review discovery and production issues; filed a joint response to a document request on May 9, 1997. (Steer Aff., at ¶ 6).

During this very same period, as early as February 1997, Morales began counseling with Thornton & Tanenhaus and Lamonsoff to develop her own claim of a sexually hostile work environment at the

Thierry Mugler perfume counter at Saks. (Tr. Arg: p. 36; Response of Thornton & Tanenhaus to Court Ordered Interrogatories, dated March 22, 1999 ("T & T Response"), at ¶¶ 1, 3). She did not tell Steer, her lawyer, or Clarins, her employer, about her consultation. Nor did she tell them that she was about to contradict the verified answer which she, herself, had sworn as the truth on January 9, 1997, that Blake's allegation of a sexually hostile work environment at the Thierry Mugler perfume counter at Saks was not true. (Steer Aff., Ex. A, at ¶¶ 9, 10 (Joint Verified Answer of Clarins and Morales)). Counseled by Thornton & Tanenhaus and co-counsel Lamonsoff, she was about to allege the very opposite.

Thornton & Tanenhaus and Lamonsoff argue that they did not learn about the Blake Complaint until April, May or June 1997. (Tr. Arg. p. 37; T & T Response, ¶ 3; Letter from Edward Tanenhaus supplementing T & T Response, dated March 29, 1999 ("Tanenhaus Supplemental Letter")). They were unable to say exactly when because, they assert, they had "nothing in the file." (Tr. Arg. p. 37). They acknowledge that they learned that Balkin was "harassing Blake and other people," but they claim not to have known until June 1997 that Morales had been sued by Blake, and was already represented by counsel. (Tr. Arg. pp. 37–38).

If Thornton & Tanenhaus and Lamonsoff did not know these essential facts about their client, and I find it hard to believe that they were as completely ignorant as they claim, they certainly should have found out, and they concede that "in hindsight, we should have [investigated]." (Tr. Arg. p. 38). Thornton & Tanenhaus and Lamonsoff made no effort to learn if Morales had counsel, or was implicated in some fashion in the *Blake* Proceeding. Had they inquired, they would undoubtedly have learned that Morales was already a respondent; that she was represented by counsel who also represented Clarins; that she had sworn to denials of sexual harass-ment which she was about to contradict; and that they were in position, as Morales' new counsel, to learn secrets and confidences that Morales shared with Clarins, through Steer's joint representation of her and Clarins.

### C. *Morales' EEOC Charge and the Consolidated Balkin Actions*

On or about April 28, 1997, one week before she met with Steer to develop a response by her and Clarins to Blake's discovery request, Morales filed her own complaint against Saks, Clarins and Balkin in the Equal Employment Opportunity Commission for the District of New York. (Affidavit of Lourdes Morales, dated December 21, 1998, at ¶ 10 ("Morales 12/21/98 Aff., at ___")). She did not tell Clarins of the suit she filed, and she did not tell Steer that she had created a conflict in Steer's dual representation of both Morales and Clarins. Steer learned about Morales' claim a month and a half later, on June 5, 1997, not from Morales, but from Saks' counsel. The EEOC, it appears, had neglected to serve Clarins. (Steer Aff., at ¶ 11). Steer immediately called Morales and, after several efforts, spoke to her on June 9, 1997, asking to speak to her new attorneys. (*Id.* at ¶ 12). Morales refused to identify them. (*Id.*). Steer asked the EEOC to identify Morales' counsel, but the EEOC also refused. (*Id.*). Steer then withdrew from the representation of Morales, advising her by letter dated July 29, 1997, and advising the New York City Commission on Human Rights on August 4, 1997. (*Id.* at ¶ 13, and Ex. D; Morales 12/21/98 Aff.Ex. A). Morales objected, insisting that Steer not be allowed to withdraw as her counsel, yet accusing him of misconduct. She wrote:

I strenuously ask that you reject Mr. Steers (sic) request. However I have serious misgivings with respect to Mr. Steers (sic) representation of me. I intend to notify the character committee for The Bar Association regarding his aforementioned misrepresentation of his

wrongful request to you to relieve himself of his representation of me. His grounds are baseless.

(Morales 12/21/98 Aff.Ex. C). Steer and Jones Hirsch then resigned the representation of Clarins, and Wilson Elser was substituted. (Steer Aff., at ¶¶ 15, 16).

On June 25, 1998, approximately a year later, Morales filed her suit in this court against Balkin, Saks and Clarins. (Rudich Aff., 1/5/99, Ex. B). Simultaneously, plaintiffs Krista Lorn Powell and Iris Nunez filed their suits against the same defendants, and plaintiffs Denise Felix, Ketly Calixte and Pascale Felix filed their suits against Balkin, Saks and the other perfume companies. Thornton & Tanenhaus and Lamonsoff represented all six plaintiffs. On September 8, 1998, by stipulation and order, the six lawsuits were consolidated for pre-trial discovery to discourage, among its provisions, duplicate depositions of parties and witnesses and provide other efficiencies and safeguards.[3] Jones Hirsch appeared in defense of Clarins in the Powell and Nunez actions, and Wilson Elser appeared in defense of Clarins in the Morales action.

On January 6, 1999, plaintiff Morales moved to disqualify Steer and Jones Hirsch in the Powell and Nunez actions, and filed an affidavit in which she swore that she had imparted "confidential information" to Steer (she did not indicate of what nature) that had "significant relevance" to her case against Clarins, (Morales 1/25/99 Aff., at ¶¶ 5, 8), and that she "never expected ... that [Steer] would share these confidences with Clarins." (*Id.*). Morales argues that Jones Hirsch (and Steer) represented her and Clarins in defense of the *Blake* Proceeding, while representing Clarins against her in her own proceeding. Secondly, she argues that Jones Hirsch's (and Steer's) representation of Clarins in the Nunez and Powell lawsuits is substantially related to their

representation of her in the *Blake* Proceeding. Morales also argues that Steer must be disqualified because he may be called as a material fact witness concerning information that she allegedly divulged to him during the course of the *Blake* Proceeding. Morales argues that Jones Hirsch and Steer should be disqualified under Canons 4 and 9 of the Model Code of Professional Responsibility.

## II. *DISCUSSION*

### A. *A General Perspective*

Motions to disqualify are generally not favored. *Bennett Silvershein Associates. v. Furman*, 776 F.Supp. 800, 802 (S.D.N.Y.1991). They are often tactically motivated; they cause delay and add expense; they disrupt attorney-client relationships sometimes of long standing; in short, they tend to derail the efficient progress of litigation. *See, e.g., Evans v. Artek Systems Corp.,* 715 F.2d 788, 791 (2d. Cir.1983). Thus, parties moving for disqualification carry a "heavy burden" and must satisfy "a high standard of proof." *Id.* But if there are doubts, the Second Circuit teaches, "doubts should be resolved in favor of disqualification." *Cheng v. GAF Corp.,* 631 F.2d 1052, 1059 (2d Cir.1980), judgment vacated on other grounds, 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981); *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975). Thus, a balance must be struck between being "solicitous of a client's right freely to choose his counsel," and protecting the "need to maintain the highest standards of the profession" and the "integrity of the adversary process." *Evans,* 715 F.2d at 792; *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2d Cir.1978).

### B. *Confidences and Secrets: The Jones Hirsch Firm*

The aspect of professional responsibility which this motion first requires me

---

3. Whether or not the trial is to be consolidated remains open for later consideration. The Stipulation and Order also provides that settlement negotiations are to be conducted separately.

.. 

to consider is the lawyer's responsibility to protect the client's confidences and secrets, divulged to the lawyer because of, and in connection with, the relationship of attorney and client. *Evans*, 715 F.2d at 791; ABA Comm. on Ethics and Professional Responsibility, Code of Professional Responsibility, Canon 4. Disciplinary Rule 4–101(B), as codified in New York, provides:

> Except when permitted under DR 4–101(c), a lawyer shall not knowingly: (1) Reveal a confidence or secret of a client. (2) Use a confidence or secret of a client to the disadvantage of the client. (3) Use a confidence of a client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure.

N.Y.Code of Professional Responsibility DR 4–101(B) (McKinney 1999). Breach by a counsel of the proscription may result in the counsel's disqualification. *Evans*, 715 F.2d at 791.

■■■ Such breaches by counsel tend to arise in two categories of cases: where the same attorney, or members of the attorney's firm, simultaneously represent adverse parties, the attorney and the attorney's firm are to be disqualified from both the representations, *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir.1976) (adverse representation by two firms having a common partner); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2d Cir.1977); *see also First Wisconsin Mortgage Trust v. First Wisconsin Corp.*, 584 F.2d 201 (7th Cir.1978) (*en banc*); and, second, where the same attorney, or members of the attorney's firm, represent a client in a litigation that is substantially related to an earlier, completed litigation. In that latter situation, as stated by Judge Weinfeld in *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F.Supp. 265 (S.D.N.Y.1953), the attorney is to be disqualified in order to assure that the confidentiality of the attorney-client relationship and the loyalty between attorney and client are preserved. *Evans*, 715

F.2d at 791. Furthermore, in such cases of substantial similarity of issues, the district court is required to presume that confidences and secrets were divulged by the former client to the attorney, for a requirement of proof would inevitably "tear aside the protective cloak drawn about the lawyer-client relationship," and to disqualify counsel as a prophylactic.

> To compel the client to show, in addition to establishing that the subject of the present adverse representation is related to the former, the actual confidential matters previously entrusted to the attorney and their possible value to the present client would tear aside the protective cloak drawn about the lawyer-client relationship. For the Court to probe further and sift the confidences in fact revealed would require the disclosure of the very matters intended to be protected by the rule. It would defeat an important purpose of the rule of secrecy—to encourage clients fully and freely to make known to their attorneys all facts pertinent to their cause.

*T.C. Theatre Corp.*, 113 F.Supp. at 269.

■■■ Neither of the two categories of simultaneous or successive relationship constitutes good ground to disqualify Jones Hirsch in this case. The record shows that Jones Hirsch attempted to resign from representing Morales as soon as Steer became aware that Morales had sued Clarins. Any simultaneous representation of Morales and Clarins was short, accidental, and a consequence of Morales' doing. The rule of *Cinema 5* is not applicable.

■■■ As to the issue of similar, successive relationship, there is an exception where the attorney's representation was of two, commonly interested clients, one of whom is now complaining. The essence of the representation of commonly interested, non-conflicting clients is to share information for the common interest, thereby improving effectiveness and effecting economy. The assumption of *T.C. Theatre*

*Corp.,* that "the attorney was in a position where he could have received information which his former client might reasonably have assumed that the attorney would withhold from his present client," does not fit the representation of commonly interested parties. *Allegaert v. Perot,* 565 F.2d 246, 250 (2d Cir.1977); *Cohen v. Acorn Int'l Ltd.,* 921 F.Supp. 1062, 1064 (S.D.N.Y.1995). If each client was aware of the other's relationship to the same lawyer, there is no basis to believe that confidences of one party would generally be withheld from the other. *Allegaert,* 565 F.2d at 250; *American Special Risk Insurance Co. v. Delta America Re Insurance Co.,* 634 F.Supp. 112, 121 (S.D.N.Y. 1986). The facts at bar suggest that Morales and Clarins entered into just such a relationship with Jones Hirsch—at least, so Clarins and Jones Hirsch could reasonably have believed.

For example, in *Allegaert,* the trustee for a bankrupt stock brokerage company sought to disqualify the attorneys for one of the constituent elements of the company. The record showed that that party had been invited into the ownership to provide needed financing at a critical period, and that his attorneys, although acting for the company, were generally understood to have primary loyalty to him. Other large law firms represented other constituent elements of the company. In those special circumstances, the Second Circuit held, no one could have expected that "information given to the law firms conceivably would have been held confidential from the primary clients of the firms." *Allegaert,* 565 F.2d at 250. Each of the constituent elements continued to act through their respective counsel; no lawyer had "changed sides" nor switched "from a former client to a current, adverse client." *Id.* at 251.

Similarly, in *Kempner v. Oppenheimer,* 662 F.Supp. 1271 (S.D.N.Y.1987), counsel for a broker-dealer represented both the broker-dealer and two of its employees against a claim of a customer. All ap-

peared to share a common interest in defense of the customers' claims. Subsequently, the employees confessed to having forged documents and manipulated customers' affairs in clear violation of their duties of honest and fair dealings to their employer and to their customers. Counsel terminated his representation of the employees, but continued his representation of the broker-dealer. The district court (Hon. Shirley S. Kram) denied the employees' motion to disqualify counsel. The court held that the employer and counsel "had no expectation that [the employees'] interests would become adverse;" that the employees had themselves been the cause of their becoming adverse because of their hidden, fraudulent conduct; and that, in the circumstances of the joint representation, the employees could not expect their "secrets and confidences" to be withheld from their employer. *Kempner,* 662 F.Supp. at 1278.

> The expectation that information conveyed to a co-party's counsel will be held in confidence from that attorney's client is no more plausible than the expectation that an attorney concurrently representing parties in the execution of a joint venture or franchise agreement will keep information relayed to him by one party secret from the other. In both situations, the party seeking disqualification should have been aware at the time of the previous transaction or proceeding that information garnered by attorneys in the course of furthering the common enterprise would be revealed by those attorneys to the other parties involved.

*Id.* at 1277–78. The court would not allow the perpetrators of the fraud to create a conflict by first representing to their employer and its counsel that they had acted in honest good faith and in their employer's interest, only to disclose, in the midst of the joint representation, that they had lied and that their interests were really adverse. *Id.; see also American Special*

*Risk Insurance,* 634 F.Supp. at 121–22 (corporation cannot hire opposition's law firm in one action, in order to attempt to disqualify them in another substantially related pending action).

 Where an attorney represents two or more clients who are similarly situated with regard to a lawsuit, each client must reasonably expect that facts learned from one will be available in defense of the other. That is the essential condition of a common representation. Without such a common basis, there cannot be a joint representation. *Allegaert,* 565 F.2d at 250; *Kempner,* 662 F.Supp. at 1277–78. Blake complained of a sexually hostile and discriminatory work environment caused, in part, by his supervisor, Lourdes Morales. Jones Hirsch could reasonably understand from these allegations that Morales and Clarins, at least presumptively, had a common interest, and Jones Hirsch could thus reasonably believe that its representation of Clarins could extend to the representation of Morales. I cannot credit Morales' claim that whatever she told Jones Hirsch—whether confidences and secrets or not—would be kept from Clarins. Indeed, the law requires an employee to disclose relevant information to her employer, and counsel in a joint representation. *Talvy v. American Red Cross,* 205 A.D.2d 143, 149–50, 618 N.Y.S.2d 25 (1st Dep't 1994). Information imparted for the mutual benefit of the joint clients is not privileged against either of them. *E.F. Hutton & Co. v. Brown,* 305 F.Supp. 371, 393 (S.D.Tex.1969).

 However, this does not end the analysis. The lawyer's right to transfer and utilize information for the good of both his clients does not mean that the lawyer has the right to turn against one or the other, for he owes equal loyalty to both his clients. *T.C. Theatre Corp.,* 113 F.Supp. at 268 ("A lawyer's duty of absolute loyalty to his client's interests does not end with his retainer."); *First Wisconsin Mortgage Trust v. First Wisconsin Corp.,* 422 F.Supp. 493, 496 (E.D.Wis.1976) ("individ-ual fidelity owed a former client" allows no right to prefer one client over another when litigation erupts between them), *aff'd,* 584 F.2d 201 (7th Cir.1978) (en banc); *E.F. Hutton & Co.,* 305 F.Supp. at 394–396 (same: no right to prefer long-time relationship with corporate employer over one-time relationship with officer-employee. The lawyer owes equal and "independent professional judgment" to both).

 Accepting a common representation is not a risk-free activity, for the appearance of a common interest may not reflect reality. Thus, it is incumbent upon the attorney to learn the essential facts in order both to form a professional opinion that interests are, in fact, common and not adverse, and to explain fully to each client the implications of the common representation. Both steps are necessary in order that the clients may each make an informed decision, for it is "essential that each client be given the opportunity to evaluate the need for representation free of any potential conflict." N.Y.Code of Professional Responsibility EC 5–16 (McKinney 1999). Ethical Consideration 5–16 sets out the attorney's obligation, to:

> explain fully to each client the implications of the common representation and [to] accept or continue employment only if the clients consent. If there are present other circumstances that might cause any of the multiple clients to question the undivided loyalty of the lawyer, the lawyer should also advise all of the clients of those circumstances.

N.Y.Code of Professional Responsibility EC 5–16 (McKinney 1999). If, after such full explanation it is not "obvious" that the lawyer can adequately represent the interests of each client, or if both clients, having been fully advised, do not each consent to the common representation, the lawyer must withdraw. *Id.;* N.Y.Code of Professional Responsibility DR 5–105(C) (McKinney 1999). Depending on the circum-

stances, the withdrawal may have to be from the representation of both clients.[4]

 Steer and Jones Hirsch did not adequately discharge their professional obligations to their common clients. Steer came to his view that he could represent both Morales and Clarins on only a "thumbnail sketch" from a "brief recitation" by Lily Babler, Clarins' Manager of Human Resources (Tr. Arg. p. 27), without any "independent study" (*id.* at 27–28), and without speaking to Morales individually. (*Id.* at 29). All Steer did was tell Morales that he did not "see" any conflict in his representation of both Clarins and Morales, to which Morales simply assented that "she didn't think there was a conflict either." (*Id.* at 28–30). However, it is the lawyer, not the client, who has the obligation "to search out and disclose potential conflicts," for it is the lawyer's obligation "to put the client in a position to protect himself by retaining substitute counsel if he so desires." *E.F. Hutton & Co.,* 305 F.Supp. at 398. The lawyer must be particularly circumspect where he is asked to represent both an employer and an employee, for without full understanding of all facts and circumstances, the lawyer cannot know, and cannot form a reliable opinion, that the inherent inequality of status, or particular individual interests, may not override a common interest. *Wood v. Georgia,* 450 U.S. 261, 268, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981).

I find that Steer and Jones Hirsch did not adequately discharge their professional obligations. Had they inquired fully of Morales, they would have learned whether or not she had her own grievances against Clarins or Saks or the Saks supervisor, and Jones Hirsch could have developed a foundation for proceeding further, dually for both clients or separately for one or the other. Morales, also, could have made an informed decision regarding her status

and need for independent representation. The group meeting attended by Steer, Morales and Clarins Human Resources personnel was likely to have engendered reticence rather than candor on Morales' part, and provided an inadequate basis for a professional opinion by Jones Hirsch that they could adequately represent both their clients.

Basic professional steps were not taken. The wise admonition of Ethical Consideration 5–15 is apt.

If a lawyer accepted such employment [multiple clients with potentially differing interests] and the interests did become actually differing, the lawyer would have to withdraw from employment with likelihood of resulting hardship on the clients; and for this reason it is preferable that the lawyer refuse the employment initially.

N.Y.Code of Professional Responsibility EC 5–15 (McKinney 1999). The failure of Jones Hirsch to take proper precautions has now put the firm into the very dilemma described in Ethical Consideration 5–15. Nor is its dilemma resolved by its withdrawal from the *Morales* case in favor of Wilson Elser. Morales is a key witness in the *Nunez* and *Powell* cases as well as in her own, for Morales was their supervisor, and any representation of Clarins must contemplate a vigorous cross-examination of Morales. The spectacle of a cross-examination by counsel of a client formerly represented by that counsel, on a matter touching on that very representation, offends accepted standards of professional obligations of loyalty to a former client. *E.F. Hutton & Co.,* 305 F.Supp. at 394.

 It is true that Morales also owed an obligation of candor and loyalty to her attorney, and it does not matter that the attorney was proffered by her employer rather than chosen by her independently.

4. I need not decide if a properly drawn engagement letter might permit a lawyer to withdraw in favor of one client and against another. Much may depend on the nature

and seriousness of the conflict, the nature and duration of the dual representation, and the degree of advance disclosure and consent.

But this is not a case like *Kempner v. Oppenheimer*, 662 F.Supp. 1271 (S.D.N.Y. 1987), *supra*, where the client's forgeries and misrepresentations were the very basis of the lawsuit against the employees and the employer, and where the employees' misrepresentations to their employer and to counsel formed the basis of counsel's decision to represent both employees and employer jointly. Morales' compromised candor does not excuse Jones Hirsch from its own professional responsibility to arrive at its own reasoned opinion, and to advise its clients fully of the implications of conflict to enable them each to come to their own informed judgment, about separate or common counsel. The professional, more than the lay person, has the primary obligation to evaluate a multiple representation for potentialities of conflict. *E.F. Hutton & Co.*, 305 F.Supp. at 394–96.

Clarins is already represented in the *Morales* case by Wilson Elser. It appears unlikely that Clarins will be prejudiced by substituting Wilson Elser for Jones Hirsch in the *Nunez* and *Powell* cases as well. Such a result not only preserves Morales' expectation of loyalty from her former counsel, but also promotes public confidence in the integrity of the Bar and our adversarial system. *Tekni–Plex, Inc. v. Meyner and Landis*, 89 N.Y.2d 123, 131, 651 N.Y.S.2d 954, 958, 674 N.E.2d 663 (1996); *Solow v. W.R. Grace & Co.*, 83 N.Y.2d 303, 309, 610 N.Y.S.2d 128, 131, 632 N.E.2d 437 (1994).

I therefore hold that Steer and Jones Hirsch should be disqualified to represent Clarins in the *Nunez* and *Powell* cases, as well as in the *Morales* case.

3. *The Thornton & Tanenhaus and Lamonsoff firms*

Thornton & Tanenhaus represented that they were retained by Morales, through co-counsel, Michael S. Lamonsoff, "on or about February 7, 1997," concerning the sexually hostile work environment at the Thierry Mugler perfume counter reflected in the complaint she filed against Clarins, Saks and Balkin in the EEOC on April 28, 1997. (T & T Response, at ¶ 1). Morales was, throughout this time, represented by Jones Hirsch, to defend her in the *Blake* Proceeding in relation to substantially similar allegations. Thornton & Tanenhaus claim that they learned of the Blake Complaint "in or about April, 1997" (Tanenhaus Supplemental Letter), but not of Steer's role as counsel for Morales, in defense of the Blake claim until two-and-a-half years later, in "December, 1999." (T & T Response, at ¶ 4).

Thornton & Tanenhaus' and Lamonsoff's professed lack of knowledge before April 1997, and their professed limited knowledge after April 1997, are not credible. At most, they are indicative of a preference not to know—an indifference which may even be worse. How could they have counseled their client to be a plaintiff alleging a sexually hostile environment, when their client had just sworn to a denial of just such an environment? How could they claim not to know of Steer when his name, as counsel, was on the very pleading that Morales had verified on January 9, 1997? The good faith conduct of Thornton & Tanenhaus and Lamonsoff are seriously in question.

Morales, in conversations with the lawyer for her and Clarins, was privy to the confidences and secrets each client had communicated to that lawyer. What these might have been can be known only by a "probe" that, as Judge Weinfeld cautioned should not be had. *T.C. Theatre Corp.*, 113 F.Supp. at 269. Morales worked closely with the lawyer who represented both her and Clarins on discovery matters, while at the same time being secretly represented by Thornton & Tanenhaus and Lamonsoff to file a complaint in the EEOC on substantially related issues. The knowledge presumptively gained by Thornton & Tanenhaus and Lamonsoff was of a character indelibly affecting intuition and judgment with respect to such related issues: "knowing what to ask for in

discovery, which witnesses to seek to depose, what questions to ask them, what lines of attack to abandon and .what to pursue, what settlements to accept and what offers to reject," and the like. *Ackerman. v. National Property Analysts, Inc.*, 887 F.Supp. 510, 517 (S.D.N.Y.1993) (quoting from *Ullrich v. The Hearst Corp.*, 809 F.Supp. 229 (S.D.N.Y.1992)). · In the same way .that a corporation's inside counsel cannot give advice to a group intending to sue. the corporation, so Thornton & Tanenhaus and Lamonsoff .could not co-opt Morales to sue Clarins while Morales was involved in a joint defense with . Clarins. *Ackerman*, 887 F.Supp. at 517; *see also Matter of Beiny*, 129 A.D.2d 126, 517 N.Y.S.2d 474 (1st Dep't 1987) (counsel disqualified because of misuse of discovery proceedings· to compromise confidences and secrets of adverse party); *Lipin v. Bender*, 84 N.Y.2d 562, 620 N.Y.S.2d 744, 644 N.E.2d 1300 (1994) (party's misappropriation of confidences and secrets by client; results in dismissal of party's complaint).

▪ I find further, that there was a certain deceptiveness to counsel's behavior. *Cf.* N.Y.Code of Professional Responsibility DR 7–101(A)(1) (McKinney 1999) (obligation of lawyer to represent client zealously requires lawyer to refrain from deceptive tactics). Thornton & Tanenhaus and Lamonsoff were representing Morales since February 1997 and, at least by April 1997, when they admit they learned of the *Blake* Proceeding. Thornton & Tanenhaus and Lamonsoff should have been aware, or . have made themselves aware, that another lawyer was already acting for Morales. The *Blake* matter and the *Morales* matter were closely related, each depending on their success on whether or not there was a sexually hostile work environment at the Clarins' perfume counter in Saks. Given Morales' contradictory role in that ·environment and her position as a supervisor for Clarins, Thornton & Tanenhaus and Lamonsoff had the obligation to stop their communications with Morales until they first spoke with her prior counsel.

A lawyer may not "communicate on the subject of the lawyer's representation with a party the lawyer knows to be represented by a lawyer in that matter" without consent of that party's lawyer. N.Y.Code of Professional Responsibility DR 7–104 (McKinney 1999). The *Blake* Proceeding and *Morales'* matter were sufficiently related so that Morales' counsel, once they learned of her role ·in the *Blake* Proceeding, should have sought out Jones Hirsch before continuing their discussions with her. Thornton & Tanenhaus and Lamonsoff failed to do that. Their indifference to the facts before them—the consequences of the contradiction by Morales of her oath and her common representation—is inconsistent with their ·professional obligations, and their obligation to take precautions not to compromise confidences and secrets from her joint representation. *Fund of Funds, Ltd.*, 567 F.2d at 225.

· ▪ Canon 9 of the Code of Professional Responsibility requires that a lawyer avoid not only the fact, but also the appearance, of professional impropriety. N.Y.Code of Professional Responsibility Canon 9 (McKinney 1999); *Fund of Funds, Ltd.*, 567 F.2d at 234–35. Although Canon 9 "should not be used promiscuously as a convenient tool for disqualification when the facts simply do not fit within the rubric of other specific ethical and disciplinary rules," there are circumstances where it may properly be used to disqualify counsel. *International Electronics Corp. v. Flanzer*, 527 F.2d 1288, 1295 (2d Cir.1975); *First Hawaiian Bank, v. Russell & Volkening, Inc.*, 861 F.Supp. 233, 237 (S.D.N.Y.1994) (McKenna, J.). The case at bar presents such "unusual circumstances." Exercising the responsibility of the district court to maintain high professional standards, free of violations of the Code of Professional Responsibility and the avoidance of the "appearance of impropriety," I find that Thornton & Tanenhaus and· Michael S. Lamonsoff should be dis-

qualified from representing not only Ms. Morales, but Ms. Nunez and Ms. Powell in their related cases as well, and I so hold. Nunez and Powell were employees of Clarins who were supervised by Morales, and Morales' testimony, and her involvement in bringing their cases to Lamonsoff and Thornton and Tanenhaus (Tr. Arg. p. 38–39), is a material ingredient in these cases. As Daniel Williams of Thornton & Tanenhaus acknowledged, "we fumbled the ball" (Tr. Arg.42), and therefore counsel are rightfully disqualified from the *Morales, Nunez,* and *Powell* matters.

## III. *CONCLUSION*

Accordingly, for the reasons stated, I hold that Jones Hirsch Connors and Bull, and Richard L. Steer, a partner of the firm, are disqualified from representing Clarins U.S.A. Inc. in the actions brought by Iris Nunez and Krista Lorn Powell, and that Thornton & Tanenhaus and Michael S. Lamonsoff are disqualified from representing Lourdes Morales, Iris Nunez and Krista Lorn Powell in the cases brought by them.

SO ORDERED.