**Graciano ROCCHIGIANI and Cedric Kushner Promotions, Ltd., Plaintiffs,**

v.

**WORLD BOXING COUNSEL, Defendant.**

**No. 98 Civ. 6781(LMM).**

United States District Court, S.D. New York.

Jan. 27, 2000.

Meister, Seelig & Fein, LLP, New York City, for Plaintiffs.

Ross & Hardies, New York City, for Defendant.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

Presently before the Court is (i) the motion of Plaintiff Cedric Kushner Promotions, Ltd. ("CKP") for a preliminary injunction in aid of arbitration and to file a supplemental complaint against Plaintiff Graciano Rocchigiani ("Rocchigiani") and (ii) Rocchigiani's motion to disqualify Scott N. Gelfand ("Gelfand"), individually, and Meister Seelig & Fein LLP ("MS & F"), collectively, from representing CKP in this action and to stay all proceedings against Rocchigiani pending final decision of the motion, including appeals. For the reasons set forth below, all of the motions are denied.

### 1.

A brief review of the underlying facts leading up to the instant motions, as alleged in the Complaint and Supplemental complaint, is necessary.

## The Rocchigiani–WBC Dispute

The World Boxing Counsel ("WBC") is a major prizefighting ranking organization that certifies and recognizes championship boxers in various weight divisions throughout the world. (*See* Compl. ¶ 15). The WBC promulgates rules and regulations which govern its sanctioned bouts, including the percentage of the "purse" that the individual boxers receive from WBC fights. (Compl. ¶ 8).

Rocchigiani is a professional light heavyweight boxer and a German citizen. On March 21, 1998, Rocchigiani defeated Michael Nunn ("Nunn") in what he alleges was the WBC Light Heavyweight Championship (the "Title"). According to Rocchigiani, as the new champion he had the right to defend the Title against Roy Jones, Jr. ("Jones"), whom Rocchigiani claims was then the former WBC Light Heavyweight champion. As the champion, Rocchigiani would be entitled to garner a high percentage of the Title purse. (Compl. ¶¶ 2–4).

A few months after Rocchigiani's victory over Nunn, however, the WBC declared Rocchigiani the "Interim" Light Heavyweight Champion and designated Jones, who previously was the undisputed Titleholder, as the "Champion in Recess." (Compl. ¶ 5). The WBC then set new terms for a championship bout between Jones and Rocchigiani, which included a purse split that was substantially less favorable than Rocchigiani believed he was entitled to under the WBC rules. (Compl. ¶¶ 4–6).

Rocchigiani sought to dispute the WBC's declaration that he was merely an interim champion. On August 24, 1998, he entered into a promotional agreement with CKP (the "Memorandum Agreement"), under which CKP was to become his exclusive promoter. (Suppl. Compl. ¶¶ 37–40, Ex. A ¶¶ 1, 5–8, 10). In exchange, CKP agreed to "commence and pay for legal proceedings against the WBC ... for the purpose of establishing Rocchigiani as the sole recognized champion in the light

heavyweight class...." (Suppl. Compl. ¶ 41, Ex. A ¶ 12). Additionally, CKP undertook to provide Rocchigiani with several fights, with the opponent and purse for each fight dependent upon the outcome of the litigation against the WBC. (Suppl.Compl.¶¶ 43–46, Ex. A).

On September 18, 1998, Rocchigiani signed an authorization (the "Authorization") for the retention of the Law Offices of Gelfand in connection with the contemplated litigation against the WBC, pursuant to the "joint litigation agreement" of paragraph 12 of the Memorandum Agreement. (Gelfand Decl., Ex. A). The Authorization stated that Gelfand had been "retained by CKP" pursuant to the Memorandum Agreement and that "Gelfand may act on Rocchigiani's behalf in connection with[] the Litigation, including, but not limited to, appearing as counsel of record for Rocchigiani in the Litigation." (*Id.*).

Gelfand commenced a law suit against the WBC on behalf of Rocchigiani and CKP on September 24, 1998. This action, currently pending before the Court, seeks, inter alia, a declaration that Rocchigiani is the undisputed WBC Light Heavyweight Champion. The Complaint identifies "The Law Offices of Scott N. Gelfand" as attorneys for Rocchigiani and CKP.[1]

### The CKP–Rocchigiani Dispute

After the commencement of the lawsuit against the WBC, the relationship between Rocchigiani and CKP soured. On January 11, 1999, Gelfand wrote to Dr. Hans–Joachim Rust ("Rust"), Rocchigiani's German business attorney who handled Rocchigiani's boxing contracts and participated in discussions with Gelfand regarding the status of the WBC litigation. (*See* Gelfand Suppl. Decl., Ex. C, Rust Decl. ¶¶ 1, 4). This letter noted that CKP had learned that Rocchigiani was negotiating for bouts "without CKP's knowledge and involvement[,]" which Gelfand deemed was "in derogation of CKP's rights" under the Memorandum Agreement. (Gelfand Suppl. Decl., Ex. C).

Rust responded to Gelfand's letter the next day via facsimile, questioning the validity of the Memorandum Agreement and protesting an additional letter that Gelfand had apparently faxed to Premier Television Network. (*Id.*, Ex. D).[2] Gelfand responded on January 13, 1999, disputing Dr. Rust's assertions. (*Id.*, Ex. E).

On January 15, 1999, Oppenhoff & Rädler ("O & R") wrote to Gelfand on behalf of Rocchigiani, indicating that it was now German counsel for Rocchigiani. (*Id.*, Ex. K). O & R's letter also stated that it had consulted New York counsel, Ross & Hardies, and determined that the Memorandum Agreement did not preclude Rocchigiani from negotiating for future bouts without CKP, that CKP had failed to perform its own obligations under the agreement, and, in any event, Rocchigiani was formally terminating the agreement. (*Id.*). O & R further stated that Rocchigiani would hold CKP liable for any attempts by CKP to interfere with negotiations between Rocchigiani and the television networks regarding a possible fight with Jones. (*Id.*).

On March 1, 1999, Gelfand wrote to O & R, again asserting that the Memorandum Agreement was still in effect and demanding that Rocchigiani cease negotiating to arrange fights without CKP's involvement. (Gelfand Suppl. Decl. Ex., F). Gelfand stated that this was the *"final warning"* to O & R and Rocchigiani and that CKP would move for an immediate injunction should Rocchigiani agree to any fights without CKP's involvement. (*Id.*) (emphasis in original). Nevertheless, Gelfand

---

1. On January 1, 1999, Gelfand joined the firm of Meister Seelig & Fein LLP. (Gelfand Decl. ¶ 1).

2. Although Rust asserts in his Declaration that he represented Rocchigiani from August 1998 through December 1998, (Rest Decl. ¶ 1), it is evident from this facsimile that he was still acting on Rocchigiani's behalf at least as late as January 12, 1999.

closed his letter indicating that CKP would be willing to release Rocchigiani from the Memorandum Agreement in exchange for sufficient remuneration. (*Id.*).

A series of letters were exchanged in March 1999 regarding CKP's proposal to release Rocchigiani from what CKP considered to be the still active Memorandum Agreement. (*See* Rocchigiani Decl., Ex. B). However, O & R ultimately rejected any settlement and notified Gelfand that new counsel, Ross & Hardies, had been selected as Rocchigiani's attorneys in the underlying action against the WBC. (*Id.* Ex. C).

Another letter-writing campaign ensued between Ross & Hardies and MS & F regarding the terms of MS & F's withdrawal, which was ultimately resolved by this Court's July 26, 1999 Order granting substitution of Ross & Hardies as counsel for Rocchigiani.

On October 18, 1999, MS & F filed a Demand for Arbitration with the American Arbitration Association on behalf of CKP (the "Arbitration"). (Dunning Aff. Ex. L, M). Three days later, CKP moved by Order to Show Cause for leave to file a Supplemental Complaint against Rocchigiani, realignment of the parties to reflect the Supplemental Complaint, and to enjoin Rocchigiani from entering into any agreements for, or participating in, any boxing matches without CKP's consent. Rocchigiani opposed that Order to Show Cause and filed the instant motion for disqualification of Gelfand and MS & F as counsel for CKP.

### 2.

Rocchigiani's motion to disqualify Gelfand and MS & F invokes Canons 4, 5, and 9 and various disciplinary rules of the New York State Lawyers' Code of Professional Responsibility (the "Code"). The Code, "as adopted from time to time by the Appellate Divisions of the State of New York, and as interpreted and applied by the United States Supreme Court, the United States Court of Appeals for the Second Circuit, and this court," governs the instant action. Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Civil Rule 1.5(b)(5).

The Second Circuit has long recognized that application of the Code to disqualification motions requires a fact-specific analysis. *See Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 227 (2d Cir.1977) ("[I]n deciding questions of professional ethics men of good will often differ in their conclusions."). Indeed, over forty years ago Chief Judge Kaufman aptly observed:

> When dealing with ethical principles, . . . we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is explored, and the conclusion in a particular case can be reached only after a painstaking analysis of the facts and precise application of precedent.

*United States v. Standard Oil Co.,* 136 F.Supp. 345, 367 (S.D.N.Y.1955).

This oft-quoted admonition has shaped the decisions regarding attorney disqualification in this Circuit, as courts have attempted to resolve the twin tensions underlying any such motion: "a client's right freely to choose his counsel," which "must be balanced against the need to maintain the highest standards of the profession." *Government of India v. Cook Indus., Inc.,* 569 F.2d 737, 739 (2d Cir. 1978); *accord Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir.1983). In *Board of Educ. of the City of New York v. Nyquist,* the Second Circuit noted that, with rare exceptions, disqualification is appropriate only in two kinds of cases: (1) where an attorney's conflict of interests undermine's the Court's confidence in the vigor of the attorney's representation of his client, or, more commonly, (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation. 590 F.2d 1241, 1246 (2d Cir.

1979) (citing *Fund of Funds,* 567 F.2d 225, *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384 (2d Cir.1976), and *Emle Indus., Inc. v. Patentex, Inc.,* 478 F.2d 562 (2d Cir.1973)). In either of these circumstances, an attorney's conduct would "taint the underlying trial" and disqualification is "necessary to preserve the integrity of the adversary process." *Nyquist,* 590 F.2d at 1246.

■ In situations outside of these two scenarios, however, the Second Circuit has "shown considerable reluctance to disqualify attorneys despite misgivings about the attorney's conduct." *Id.* This reluctance stems from the problems inherent in disqualification, including separation of a client from his chosen counsel, the delay in the proceedings invariably created by such motions, and because they are often interposed merely for tactical reasons. *Id.; see also Evans,* 715 F.2d at 791–92; *Allegaert v. Perot,* 565 F.2d 246, 251 (2d Cir.1977). Thus, the moving party initially bears a heavy burden of demonstrating that disqualification is appropriate. *Government of India,* 569 F.2d at 739, *Evans,* 715 F.2d at 794.

### 3.

With these criterion set forth by the Second Circuit, the Court turns to Rocchigiani's arguments for disqualification. He essentially advances four grounds: (i) that MS & F should be disqualified for suing a former client in a substantially related matter; (ii) MS & F is "per se" disqualified for taking an adverse position against Rocchigiani, when it threatened to take action against Rocchigiani while he was MS & F's client in the WBC action; (iii) in any event, disqualification is appropriate because MS & F failed to meet its obligation under DR 5–105, which requires an attorney to advise clients of the nature and implications of common representation and to obtain the client's consent prior to undertaking the joint representation; and finally (iv) MS & F should be disqualified

under Canon 9 for creating the appearance of impropriety.

### Successive Representation

■ In his moving papers, Rocchigiani argues that disqualification is appropriate because MS & F is prohibited from representing interests adverse to Rocchigiani, a former client, in this action and the Arbitration, because it is the same or substantially similar to MS & F's prior representation of Rocchigiani. (*See* Rocchigiani Mem. at 4). This potential conflict, involving successive representation, is usually governed by a three-part "substantial relationship test" for determining if disqualification is warranted, in which the movant must show:

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir.1983) (citing cases).

■ However, "before the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he could have received information which his former client might reasonably have assumed the attorney would withhold from his present client." *Allegaert,* 565 F.2d at 250. In *Allegaert,* the Second Circuit created an exception to the substantial relationship test, where the prior representation by the attorney in question was within the context of a joint representation between a former, but now adverse, client and a present, long-standing, client. Under such circumstances, "the substantial relationship is inapposite," as the former client could not reasonably expect confidences imparted to the attorney

during the course of the joint representation to be withheld from the other client. *Id.*

■ Although Rocchigiani and Dr. Rust claim that they were unaware that CKP would be a plaintiff in the litigation against the WBC, (*see* Rocchigiani Decl. ¶¶ 5, 6; Rust Decl. ¶ 5), the record before the Court indicates that Rocchigiani knew, or should have known, that MS & F was representing both CKP and Rocchigiani in the claim against the WBC. At the outset of the arrangement between Rocchigiani and CKP, the Memorandum Agreement specifically called for *CKP* to "undertake[ ] to commence and pay for legal proceedings against the WBC . . . for the purpose of establishing Rocchigiani as the sole recognized WBC champion in the light heavyweight class." (Kushner Decl., Ex. A at ¶ 12). Likewise, the Authorization specifically stated that Gelfand *"has been retained by CKP* pursuant to paragraph 12 of the [Memorandum Agreement], and that Rocchigiani expressly authorizes the retention of, and agrees that Gelfand may act on Rocchigiani's behalf . . . including . . . appearing as counsel of record for Rocchigiani" in connection with the litigation against the WBC. (Gelfand Decl., Ex. A (emphasis added)).

Moreover, after the action against the WBC was commenced, it is clear that Rocchigiani's attorneys not only knew that Gelfand was jointly representing CKP, but were actively assisting in the joint representation. For example, a letter from Dr. Rust's office to Gelfand dated November 4, 1998 discussing in detail the WBC's Answer to the Complaint demonstrates Dr. Rust's familiarity with the litigation. (*See* Gelfand Suppl. Decl., Ex. A). Indeed, the subject line of the letter itself is captioned "Rocchigiani, CKP vs. WBC." *Id.*

Integral to the Second Circuit's decision in *Allegaert,* and in this Court's holding, is Gelfand's "continuous and unbroken legal relationship with [its] primary client[ ]," CKP. *Allegaert,* 565 F.2d at 251. In this case Gelfand did not "change[ ] sides from a former client to a current, adverse client." *Id.* Any representation of Rocchigiani by Gelfand was done with Rocchigiani's, or at least his German attorney's, knowledge that Gelfand was "still representing [CKP's] interests and would continue to do so." *Id.; see also Kempner v.. Oppenheimer & Co.,* 662 F.Supp. 1271, 1278 (S.D.N.Y.1987) ("[A]s in the *Allegaert* line of cases, it is the client, and not the attorney, who has changed position.").

## Concurrent Representation

■ In his reply papers, Rocchigiani urges the Court to disqualify MS & F because Gelfand threatened to take action against Rocchigiani regarding the contract dispute with CKP, while MS & F was still representing Rocchigiani in the action against the WBC. Specifically, Rocchigiani alleges that MS & F "investigated and began preparations for the injunction proceedings which are now before the Court" prior to the substitution of Ross & Hardies as counsel of Rocchigiani. (Rocchigiani Reply Mem. at 1).

In *Cinema 5 Ltd. v. Cinerama, Inc.,* the Second Circuit stated "[p]utting it as mildly as we can, we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned." *Cinema 5,* 528 F.2d 1384, 1386 (2d Cir.1976). In contrast to cases of successive representation, such a conflict touches less upon any confidences that may have been imparted in the prior representation, but instead on the duty of undivided loyalty which an attorney owes to each client under Canons 5 and 9. Thus, when an attorney sues a client that he is actively representing,

> the "substantial relationship" test does not set a sufficiently high standard by which the necessity for disqualification should be determined. That test may properly be applied only where the representation of a former client has been terminated and the parameters of such relationship have been fixed. Where the

relationship is a continuing one, adverse representation is prima facie improper ... and the attorney must be prepared to show, at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation.

*Id.* at 1387.

The admonition given by the Second Circuit in *Cinema 5* can be summed up in its biblical quote: " 'no man can serve two masters.' " 528 F.2d at 1386 (quoting Matthew 6:24). Yet, the conflict in *Cinema 5* was obvious. An attorney, who was a partner in both a Buffalo and a New York law firm, sued, in his capacity as a partner of his Buffalo firm, a party that was a client of his New York firm. *Id.* at 1386. Such a conflict clearly undermines a court's confidence in the vigor of an attorney's representation of his client and taints the underlying trial. *Nyquist,* 590 F.2d at 1246.

In this case, however, MS & F did not sue Rocchigiani while he was a client of the firm. Instead, the "conflict" that occurred was limited to the period between Rocchigiani's repudiation of the Memorandum Agreement and Ross & Hardies' substitution as counsel. During this time, a series of hostile letters were exchanged between MS & F and Rocchigiani's German and American counsel. One letter, written by Gelfand on March 1, 1999, threatened legal action against Rocchigiani while Rocchigiani was still a client in the WBC action. The letter stated that *"this is our final warning to you and Rocchigiani* ... [s]hould Rocchigiani agree to such a fight without CKP's involvement, rest assured we will *immediately* move for [an] injunction." (Dunning Aff. Ex. E (emphasis in original)).

On its face, this letter clearly threatens litigation. Nevertheless, without more, it does not warrant disqualification of MS & F under the *Cinema 5* per se test. Placed within the context of the series of letters between MS & F and O & R, Gelfand's letter only demonstrates posturing, albeit in inflammatory language, for the terms of Rocchigiani's withdrawal from the Memorandum Agreement. (*See* Gelfand Suppl. Decl., Exs. F–J).

*Stratagem Dev. Corp. v. Heron Int'l N.V.,* 756 F.Supp. 789 (S.D.N.Y.1991), does not sway the Court to reach a contrary conclusion. In that case, Judge Kram disqualified a law firm from suing a former client where it was "undisputed that the Firm was clearly contemplating, if not actively planning, litigation against its [former] client's parent corporation" prior to withdrawing as counsel from the former client. *Id.* at 793. Indeed, Judge Kram found that the firm in question investigated and drafted the complaint against its client's parent company before terminating its representation. *Id.*

The record before the Court in this case, however, indicates that no actual preparation for litigation against Rocchigiani occurred until after Ross & Hardies was substituted as counsel. Gelfand has submitted a sworn affidavit stating that no research, investigations, drafting or meetings were conducted by MS & F during March 1999 in connection with the action against Rocchigiani. (*See* Gelfand Suppl. Decl. ¶¶ 41, 42, 53(a)—(d)). While MS & F did ultimately bring a motion for an injunction against Rocchigiani, this was done many months after Ross & Hardies was substituted as counsel.

Moreover, even if the Court applied the *Cinema 5* test, the relatively unusual contractual alignment of the parties mitigates against disqualification. The Second Circuit held in *Cinema 5* that while adverse concurrent representation is "prima facie improper," an attorney might avoid disqualification if he could show that there was "no actual or apparent conflict in loyalties or diminution in the vigor of his representation." *Cinema 5,* 528 F.2d at 1387; *see also Nyquist,* 590 F.2d at 1246 (noting a conflict that undermines the court's confidence in the vigor of an attor-

ney's representation of his client as one appropriate ground for disqualification).

During the period between Rocchigiani's repudiation of the Memorandum Agreement and the substitution of Ross & Hardies as counsel for Rocchigiani, the interests of Rocchigiani and CKP remained aligned with respect to the action against the WBC. A favorable ruling against the WBC would result in a declaration of Rocchigiani as the WBC World Light Heavyweight Champion. It also would trigger significantly more lucrative promotional benefits to CKP under the Memorandum Agreement. (*See* Suppl. Compl., Exs. A ¶¶ 3–5). The Court is, thus, confident in MS & F's vigor in its prosecution of the action against the WBC on behalf of both Rocchigiani and CKP. Indeed, Rocchigiani has not contested the quality or determination of MSF's representation of Rocchigiani prior to the substitution of Ross & Hardies.

### DR 5–105

■ DR 5–105 governs an attorney's obligation of disclosure and consent relating to the joint representation of multiple clients. The rule consists of five parts, the first three of which are relevant here. Section A deals with conflicts that arise at the outset of representation, forbidding an attorney from accepting employment that is certain or likely to bring the attorney into conflict with a current client. Section B relates to these conflicts when they arise between multiple clients during the course of representation and, likewise, forbids an attorney to continue representing both parties after a conflict arises. Section C contains an exception to either of these conflicts that allows an attorney to continue representing both parties. However, this exception applies only if it is "obvious" that the attorney can "adequately represent" the interests of each client and each

client consents after full disclosure by the attorney of the possible effect of such multiple representation on the attorney's independent professional judgment.

Rocchigiani argues that Gelfand violated DR 5–105 because he failed to disclose the nature and implications of the joint representation and failed to obtain Rocchigiani's consent to the representation when he first took Rocchigiani as a client and later when Rocchigiani repudiated the Memorandum Agreement. (*See* Rocchigiani Reply Mem. at 5). In support of this argument, Rocchigiani relies on two cases, *Felix v. Balkin*, 49 F.Supp.2d 260 (S.D.N.Y.1999) and *Burda Media, Inc. v. Blumenberg*, No. 97 Civ. 7167(RWS), 1999 WL 1021104 (S.D.N.Y. Nov.8, 1999) (*"Burda II"*), aff'g after reconsideration, 1999 WL 413469 (S.D.N.Y. June 21, 1999) (*"Burdha I"*)[3] These cases, however, are unpersuasive.

In *Felix*, Jones Hirsch Connors & Bull ("Jones Hirsch") represented both an employee and her employer as defendants in a sexual harassment lawsuit. Judge Hellerstein found that Jones Hirsch failed to adequately inquire at the outset of its representation whether the employee had any adverse interests against her employer. *Felix*, 49 F.Supp.2d at 271. In fact, the employee did have a significant grievance against her employer and she filed her own related sexual harassment suit shortly thereafter. *Id.* at 265–66.

Likewise, the conflict that gave rise to the disqualification in *Burdha* existed at the outset of the common representation. Early in that case, defendants Mr. and Mrs. Blumenberg entered into a confidential settlement with the plaintiffs. *Burdha I* at *2. The attorney who was disqualified, Larry Carlin ("Carlin"), represented the Blumenbergs in connection with that settlement and a number of unrelated matters.[4] *Id.* at *15. However, before the

---

3. *Burda II* was decided shortly after Rocchigiani's opposition papers were filed and a copy of the opinion was forwarded to the Court by Rocchigiani's counsel.

4. While the attorney claimed that the Blumenbergs were not clients, he received $20,000 in fees in connection with the settlement. Judge Sweet, therefore, found sufficient as-

Blumenbergs entered into the settlement, Hot Line Delivery Co. ("Hot Line"), a co-defendant also represented by Carlin, interposed a cross-claim for indemnification against the Blumenbergs. *Burdha I* at *6. Judge Sweet disqualified Carlin because, among other reasons, he failed to advise the Blumenbergs of the "potentially serious conflict issues presented by any common representation of [the] Blumenberg[s] and Hot Line." *Burda II*, at *4.

Unlike the conflicts in *Felix* and *Burdha*, the conflict between Rocchigiani and CKP did not exist from the outset of their common representation; their interests were the same with respect to the action against the WBC and contractually identified in the Memorandum Agreement. Rocchigiani concedes in his moving papers that the actual conflict did not arise until January 1999, (*see* Rocchigiani Reply Mem. at 8), when he repudiated the Memorandum Agreement. Thus, the Court is not confronted with an attorney who failed to investigate and identify potentially serious diverging interests between commonly represented parties that were in existence from the start of the representation.

Contrary to Rocchigiani's assertions, an attorney is not always required to advise and obtain the consent of his clients under DR 5–505(C) prior to undertaking joint representation. *See, e.g., Kempner v. Oppenheimer & Co., Inc.*, 662 F.Supp. 1271, 1278 (S.D.N.Y.1987) (declining to disqualify attorney under DR 5–105 where the attorney had no reason to suspect that a conflict would develop between jointly represented clients). The language of the Rule itself belies this assertion. DR 5–105(C) is applicable when in an attorney's "independent and professional judgment" his common representation is "likely to involve him in representing differing interests." DR 5–105(A), (B).

That is not to say that as a matter of practice a reasonably prudent attorney should not avail himself of the advice and consent provisions of DR 5–105(C) whenever he engages in common representation of parties to a lawsuit.[5] This is particularly true where, as here, the client is a layperson. The reasons for doing so are legion, but the foremost reason would be to avoid a motion to disqualify by a dissatisfied former client, such as the one being considered here. Had Gelfand followed the provisions of DR 5–105(C)—irrespective of whether or not he could identify a conflict at the outset—at the very least it would have severely undercut Rocchigiani's argument for disqualification, and at best he could have avoided the motion entirely. Indeed, MS & F may have saved the parties from writing (and the Court from reading) some 102 pages of legal argument and 61 pages of affidavits and declarations relating to Rocchigiani's motion.

Disqualification based on the actual conflict which surfaced in January 1999 also is inappropriate under DR 5–105. It is true that DR 5–105(B) obligates an attorney to continually monitor the circumstances underlying common representation and to avail himself of the advice and consent provisions of DR 5–105(C) should such a conflict arise. The conflict here, however, was created by Rocchigiani himself and the nature of the conflict was such that it was clear to both MS & F and Rocchigiani's counsel. More importantly, as noted earlier in the opinion, nothing significant occurred prior to the substitution of Ross & Hardies with respect to the underlying litigation against the WBC that would "'taint the underlying trial.'" *Nyquist*, 590 F.2d at 1246; *see also Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d.

---

pects of an attorney-client relationship to trigger an inquiry into an potential conflict. *Id.* at *15.

**5.** Indeed, one commentator has suggested that the advice and consent under DR 5–

105(C) is *required* whenever an attorney represents two parties in a litigation matter. *See* Roy Simon, *Simon's New York Code of Professional Responsibility Annotated* (West 1999).

Cir.1981) (holding that motions to disqualify should be granted "only when a violation of the Canons of the Code of Professional Responsibility poses a significant risk of trial taint.").

Finally, the fact that Gelfand refused to withdraw as counsel after Rocchigiani demanded that he do so is not indicative of Gelfand violating DR 5–105. Instead, it may be a violation of DR 2–110(B)(4), which mandates that an attorney must withdraw from representing a client who discharges the attorney. While Gelfand's refusal to withdraw could ultimately subject him to disciplinary action for violating DR 2–110(B)(4), it does not compel the Court to disqualify him from representing CKP in this action. "Given the availability of both federal and state comprehensive disciplinary machinery ... there is usually no need to deal with all other kinds of ethical violations in the very litigation in which they surface." *Nyquist,* 590 F.2d at 1246.

### Canon 9

■ As a final ground for disqualification, Rocchigiani argues that Gelfand's conduct created such an appearance of impropriety as to justify disqualification under Canon 9. Courts of this Circuit, however, are loath to utilize Canon 9 for disqualification. Indeed, the Second Circuit has warned that Canon 9 "should not be used promiscuously as a convenient tool for disqualification when the facts simply do not fit within the rubric of other specific ethical and disciplinary rules." *International Elecs. Corp. v. Flanzer,* 527 F.2d 1288, 1295 (2d Cir.1975).

As noted above, there are insufficient grounds to justify disqualification of Gelfand from representing CKP in this action. This is not to say that his actions prior to the substitution of Ross & Hardies demonstrate a model of professional conduct. To the contrary, with his caustic letter to Rocchigiani's German counsel he has come

close to disqualification under *Cinema 5.* Moreover, Gelfand's refusal to withdraw from representing Rocchigiani after Rocchigiani demanded that he do so falls short of what is expected of lawyers in this Court. Nevertheless, because this Court finds no taint to the underlying litigation, disqualification under Canon 9 is inappropriate.

### 4.

Rocchigiani's motion to stay CKP's Arbitration against Rocchigiani for breach of the Memorandum Agreement, "pending a final decision disqualifying MS & F, and any appeals therefrom," (Rocchigiani Opp. Mem. at 3), is denied.

### 5.

CKP's motion for a preliminary injunction in aid of arbitration and for leave to file a supplemental complaint is denied as unnecessary.[6] Rocchigiani and CKP have agreed to resolve their dispute by arbitration and that is the proper forum for resolution of CKP's claims. *See Fils et Cables d'Acier de Lens v. Midland Metals Corp.,* 584 F.Supp. 240, 244 (S.D.N.Y.1984) ("[A] court is precluded from considering any issue that the parties have voluntarily agreed to arbitrate.").

### 6.

CKP's motion for realignment of the parties is denied as unnecessary in view of CKP's and Rocchigiani's agreement to arbitrate.

### 7.

On November 23, 1999, Ross & Hardies advised the Court that it was seeking to submit a separate opposition to the WBC's motion for summary judgment, that it had already received the consent of the WBC's counsel to do so, and that it would notify the Court when they had reached an agreement with respect to a briefing schedule. The court hereby grants permission to Rocchigiani to file such opposition and directs Ross & Hardies to notify

---

**6.** CKP's request for an injunction against Rocchigiani fighting Jones is moot. There

was no scheduled November 6, 1999 fight between Rocchigiani and Jones.

the Court of a mutually agreed briefing schedule not later than February 15, 2000.